[S.F. No. 24623. Oct. 21, 1985.]

VICTORIA ISBISTER, a Minor, etc., et al.,
Plaintiffs and Respondents, v.
BOYS' CLUB OF SANTA CRUZ, INC., Defendant and Appellant.

74

COUNSEL

Robert E. Bosso, Sara Clarenbach and Adams, Kevin, Kehoe, Bosso, Sachs & Bates for Defendants and Appellants.

Shadle, Hunt & Hagar, Ernest L. Hunt, Jr., Horvitz & Greines, Ellis J. Horvitz, Kent L. Richland, Hughes, Hubbard & Reed, Malcolm E. Wheeler, Frank B. Blum, Jr., Alvarado, Rus & McClellan and Raymond G. Alvarado as Amici Curiae on behalf of Defendants and Appellants.

Susan M. Popik, Diane E. Thompson, Majorie E. Cox, Anna M. Rossi, Rogers, Joseph, O'Donnell & Quinn, Susan L. Paulus, Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz and Edward F. Newman for Plaintiffs and Respondents.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Marian M. Johnston, Deputy Attorney General, Ellen S. George, B. Scott Silverman, Lisbeth Jones, Morrison & Foerster, Ware, Fletcher & Freidenrich and Robert T. Russell as Amici Curiae on behalf of Plaintiffs and Respondents.

OPINION

GRODIN, J.—The Unruh Civil Rights Act (Civ. Code, § 51) guarantees every person in California "full and equal" access to "all business establishments of every kind whatsoever."[1] The Act is this state's bulwark against arbitrary discrimination in places of public accommodation. Absent the principle it codifies, thousands of facilities in private ownership, but otherwise open to the public, would be free under state law to exclude people for invidious reasons like sex, religion, age, and even race. The

---

[1]Section 51 provides in pertinent part: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." We sometimes refer to the statute hereafter as the Unruh Act, or simply the Act.

Legislature's desire to banish such practices from California's community life has led this court to interpret the Act's coverage "in the broadest sense reasonably possible." (*Burks* v. *Poppy Construction Co.* (1962) 57 Cal.2d 463, 468 [20 Cal.Rptr. 609, 370 P.2d 313].)

The Boys' Club of Santa Cruz, Inc., is a private charitable organization which operates a community recreational facility.[2] The Club is open to any local boy for a nominal membership fee, but plaintiffs in this case were excluded because they are girls. We must decide, among other things, whether the Club is among those "business establishments" covered by the Act. If the Act does not apply, state law allows the Club to discriminate against female children, or on any other basis it chooses.

This state's law, as we shall demonstrate, has long prohibited arbitrary discrimination in places of public accommodation or amusement. Viewing the Unruh Act in its historical context, and in light of prior decisions of this court, we conclude that the term "business establishment" was meant to embrace, rather than reject, that well established principle. On the particular record before us, there can be no doubt that the facility operated by the Boys' Club comes within the scope of that principle: its recreational facilities are open to the community generally but closed to members of a particular group. These facilities are the Club's principal activity and reason for existence. We therefore agree with the Santa Cruz Superior Court, which found that the Club is a "business establishment" for purposes of the Act.

Like the superior court, we also reject the contention that the Club may nonetheless discriminate against girls because their participation would contravene "the nature of its business enterprise and . . . the facilities provided." (See *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 741 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161], cert. den., 459 U.S. 858 [74 L.Ed.2d 111, 103 S.Ct. 129] (hereafter *Marina Point*).) There is no substantial evidence on this record that the Club's programs, services, and facilities are unsuitable for girls, or that inclusion of both sexes in these programs would diminish their value or effectiveness. Nor is there proof that female memberships would cause serious and permanent danger to the Club's funding or its relationship with its national organization. We will therefore affirm the judgment of the trial court.

We emphasize the limited scope of our holding. Nothing in our analysis necessarily extends to organizations which operate facilities not generally

---

[2] We hereafter sometimes refer to both the local facility and the national organization with which it is affiliated as the Boys' Club or the Club. In other instances, the local Club is identified separately.

open to the public, or which maintain objectives and programs to which the operation of facilities is merely incidental. Nor does our holding necessarily apply to an organization which can demonstrate a compelling need to maintain single-sex facilities. Finally, we do not preclude the Legislature from amending the Act to allow the Boys' Club to maintain its male-only policy. The validity of any such future legislation is not before us.

## FACTS

The Boys' Club of Santa Cruz, Inc., a private nonprofit California corporation, owns and operates a building which includes such recreational facilities as a gymnasium, an indoor competition-size swimming pool, a snack bar, and craft and game areas. The local Club is affiliated with the Boys' Clubs of America, Inc., a congressionally chartered organization. (See 36 U.S.C.A. § 691 et seq.)

Only members may use the Club's programs and facilities, but membership is open to all Santa Cruz children between eight and eighteen, so long as they are male. Members pay only a $3.25 annual membership fee. The principal source of funding for the Club—providing approximately 50 percent of its annual budget—is a gift in trust from John T. and Ruth M. Mallery (the Mallery Trust). The Mallerys also donated the money for the Club building. The trial court found that the Mallery Trust was "unrestricted" as to gender. In 1978, after this suit began, the Mallerys made a $200,000 donation which was expressly conditioned on restriction of membership to boys. Remaining funds come from the United Way campaign, an annual golf event, and miscellaneous private donations.

The Club is run by an adult board of directors, officers of the corporation, and a paid staff headed by an executive director. Club members have no power over Club affairs or membership policies.

The Club is unique in northern Santa Cruz County in the range and low cost of the recreational facilities and programs it provides under one roof. No single program or facility open to girls offers a similar range of activities at similar cost.

In 1977, plaintiff girls were denied access to the Boys' Club's membership and facilities solely on the basis of their sex. This action for injunctive and declaratory relief followed. After a trial on the merits, the court found that the Club's membership policy violated the Unruh Act, caused harm to the rejected girls, and deprived members of a nondiscriminatory environment. It permanently enjoined the Club from denying membership or access to its facilities to girls.

ANALYSIS

■ 1. *The Boys' Club is a "business establishment" covered by the Unruh Act.*

The Club first contends that it is not a "business establishment" covered by the Act. We disagree.

Adopted in 1959, the Unruh Act, "[e]manat[es] from and [is] modeled upon" California's earlier statute forbidding arbitrary discrimination in "public accommodations." *(Marina Point, supra,* 30 Cal.3d at p. 731.) The prior law, first adopted in 1897, derived from the common law doctrine that certain public enterprises are obliged to serve all without arbitrary discrimination. *(In re Cox* (1970) 3 Cal.3d 205, 212 [90 Cal.Rptr. 24, 474 P.2d 992]; see Tobriner & Grodin, *The Individual and the Public Service Enterprise in the New Industrial State* (1967) 55 Cal.L.Rev. 1247, 1250 [fns. omitted].) The Unruh Act "*expanded* the reach of [the prior public accommodations statute] from common carriers and *places of public accommodation and recreation,* e.g., railroads, hotels, restaurants, theaters, and the like, to include 'all business establishments of every kind whatsoever.'" *(Marina Point, supra,* 30 Cal.3d at p. 731 (italics added), citing Horowitz, *The 1959 California Equal Rights in "Business Establishments" Statute—A Problem in Statutory Application* (1960) 33 So.Cal.L.Rev. 260, 272-294 (hereafter Horowitz).)

By its use of the emphatic words "all" and "of every kind whatsoever," the Legislature intended that the phrase "business establishments" be interpreted "in the broadest sense reasonably possible." *(Burks, supra,* 57 Cal.2d at p. 468.) Indeed, the Unruh Act was adopted out of concern that the courts were construing the 1897 public accommodations statute too strictly.

That prior law, a model for subsequent civil rights legislation in other jurisdictions both state and federal, prohibited arbitrary discrimination by enumerated lodging, eating, transportation, recreational, and entertainment facilities as well as "all other places of public accommodation or amusement, . . ." (See Stats. 1897, ch. 108, § 1, p. 137, as amended.) However, despite periodic additions to the list of covered facilities (see Stats. 1919, ch. 210, § 1, p. 309 [public conveyances]; Stats. 1923, ch. 235, § 1, p. 485 [soda fountains]), lower appellate courts used the principle *ejusdem generis* to limit the law's reach. (See, e.g., *Reed* v. *Hollywood Professional School* (1959) 169 Cal.App.2d Supp. 887, 890 [338 P.2d 633] [private school not covered]; *Coleman* v. *Middlestaff* (1957) 147 Cal.App.2d Supp. 833, 834-836 [305 P.2d 1020] [dentist's office not covered]; *Long* v. *Mountain View*

*Cemetery Assn.* (1955) 130 Cal.App.2d 328, 329 [278 P.2d 945] [private cemetery not covered].) "Accordingly, the Legislature, enacting the Unruh Act, modified the [prior] mandate . . . and broadened its scope [to include] all business establishments of every kind whatsoever." (*Cox, supra,* 3 Cal.3d at p. 214.)

The original version of the bill which became the Unruh Act extended its antidiscriminatory provisions to "all public or private groups, organizations, associations, business establishments, schools, and public facilities; . . ." (See Assem. Bill No. 594, as introduced Jan. 21, 1959.) Later versions dropped all the specific enumerations except "business establishments" but added to the latter phrase the modifying words "of every kind whatsoever."

"The broadened scope of business establishments in the final version of the bill, in our view, is indicative of an intent by the Legislature to include therein *all private and public groups or organizations* [specified in the original bill] that may reasonably be found to constitute 'business establishments of every type [*sic*] whatsoever.'" (*O'Connor* v. *Village Green Owners Assn.* (1983) 33 Cal.3d 790, 795-796 [191 Cal.Rptr. 320, 662 P.2d 427], italics added.[3]) Considering the Act's ancestry, its phrase "business establishments" clearly includes at least those facilities subject to the predecessor statute—i.e., "places of public accommodation or amusement." (See 34 Ops.Cal.Atty.Gen. 230, 232 (1959); *Horowitz, supra,* 33 So.Cal.L.Rev. 260, 289; cf., *Burks, supra,* 57 Cal.2d at p. 471.)

Courts in other jurisdictions have consistently held that broad-based non-profit community service organizations like the Boys' Club are "public accommodations" covered by statutes analogous to California's pre-1959 civil rights law. For example, in language similar to our prior law, title II of the federal Civil Rights Act of 1964 (42 U.S.C.A. § 2000a et seq.) grants "all persons" the right to "full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin."[4] A

---

[3]Thus, this court has already rejected Justice Mosk's view that the amendment of the original bill was intended to *eliminate* all coverage of "private groups," organizations, and facilities.

[4]Title II, the "public accommodations" provision of the Civil Rights Act, only prohibits discrimination on the specified "ground[s]." Hence, it does not cover gender-based discrimination. (E.g., *Seidenberg* v. *McSorley's Old Ale House* (S.D.N.Y. 1969) 308 F.Supp. 1253, 1255-1256; compare *Cox, supra,* 3 Cal.3d at p. 216 [because pre-1974 Unruh Act granted "all persons" rights against discrimination "no matter what" their race, color, religion, ancestry, or national origin, it barred all arbitrary discrimination, even if on the basis of a class membership not specifically mentioned in the statute].) Nor is gender-based discrimi-

"place of public accommodation" includes, among other specified facilities, "any motion picture house, theater, concert hall, sports arena, stadium *or other place of exhibition or entertainment.*" (*Id.,* § 2000a(b)(3), italics added.) Title II has been applied to private, nonprofit recreational organizations which offer memberships to the public at large and exclude only a particular class of persons protected by the statute. (E.g., *Smith* v. *Young Men's Christian Ass'n of Montgomery* (5th Cir. 1972) 462 F.2d 634, 649; *Nesmith* v. *Young Men's Christian Ass'n of Raleigh, N.C.* (4th Cir. 1968) 397 F.2d 96, 100; *United States* v. *Slidell Youth Football Ass'n* (E.D.La. 1974) 387 F.Supp. 474, 482-484; cf., *Daniel* v. *Paul* (1969) 395 U.S. 298, 306-308 [23 L.Ed.2d 318, 325-327, 89 S.Ct. 1697].)[5]

The same rule has obtained under "public accommodations" legislation in other states. New Jersey's Law Against Discrimination bars sexual bias, among other things, in "places of public accommodation." These are defined to include, without limitation, a long list of facilities and services, as well as "other place[s] of amusement." (N.J.Stat. Ann., § 10:5-5, subd. *l.*) There is an express exception for accommodations which are "distinctly private" (*ibid.*) or "in [their] nature reasonably restricted exclusively to individuals of one sex." (N.J. Stat. Ann., § 10:5-12, subd. f.) The New Jersey courts have ruled that a local Little League was a covered "place of amusement," too unselective in membership to be "distinctly private," and suited in its goals and facilities to participation by girls. (*National Org. for W., Essex Ch.* v. *Little L. Base., Inc.* (1974) 127 N.J.Super. 522 [318 A.2d 33, 35 et seq., 66 A.L.R.3d 1247], affd. summarily (1974) 67 N.J. 320 [338 A.2d 198].)[6] Recently the New York Court of Appeals said that state's similar Human Rights Law (Exec. Law, § 290 et seq.) prohibits gender-based membership restrictions by United States Power Squadrons, a national boating safety and educational organization. (*U.S. Power Squad.* v. *State*

---

nation on a ground for denial of status as a "private club" exempt from federal income tax. (26 U.S.C.A. § 501(c)(7), (h)(8)(i).) The employment provisions of the Civil Rights Act (tit. VII, 42 U.S.C.A. § 2000e et seq.) do ban discrimination on the basis of sex, except where gender is a "bona fide occupational qualification." (*Id.,* § 2000e-2(a), (e).)

[5]Each of these cases rejected contentions that the defendant organizations were free to discriminate as "private club[s] . . . not in fact open to the public." (42 U.S.C.A. § 2000a(e).) The evidence suggested that "members" were not selected on a social basis, that there was no "plan or purpose" to exclude the public at large except on a single, prohibited ground (see *Tillman* v. *Wheaton-Haven Recreation Assn.* (1973) 410 U.S. 431, 438 [35 L.Ed.2d 403, 409, 93 S.Ct. 1090]), and that the organizations provided public services with public funding support. That these facts are also true of the Boys' Club is undisputed.

[6]The appellate division opined that facilities or activities which would involve breaches of bodily privacy were properly confined to one sex under New Jersey's specific statutory exception. (318 A.2d at p. 38.) The Boys' Club fits that description, but our statute contains no similar single-sex exemption. The language of the Unruh Act treats sex just like every other form of prohibited discrimination.

*Human R. App. Bd.* (1983) 59 N.Y.2d 401 [465 N.Y.S.2d 871, 874-877, 452 N.E.2d 1199].)[7]

These principles and authorities persuade us that the Boys' Club of Santa Cruz is a "place of public accommodation or amusement," and thus a "business establishment" covered by the Act. The Club certainly qualifies as a "place of amusement." Indeed, its primary function is to operate a permanent physical plant offering established recreational facilities which patrons may use at their convenience during the hours the Club is open.

Moreover, the Club is classically "public" in its operation. It opens its recreational doors to the entire youthful population of Santa Cruz, with the sole condition that its users be male. (See *National Org. for W., Essex Ch. supra,* 318 A.2d at pp. 37-38.) There is no attempt to select or restrict membership or access on the basis of personal, cultural, or religious affinity, as a private club might do.[8]

While there are some organized activities, the emphasis is on drop-in use of the Club's facilities, thus minimizing any sense of social cohesiveness, shared identity, or continuity. Boys who join the Club have no power in its affairs and no control over who else may be members. A fee, though not a large one, is charged for the annually renewable membership. Thus, the Club provides an atmosphere deemed characteristic of a "public accommodation" by the principal commentator on the Unruh Act; relations with and among its members are of a kind which take place more or less in "public view," and are of a "relatively nongratuitous, noncontinuous, nonpersonal, and nonsocial sort." (*Horowitz, supra,* 33 So.Cal.L.Rev. 260, 287, 288.)[9]

---

[7]All persons could take the Squadrons' basic boating safety course, but only men over 18 could become members. Only members could take the advanced boating course; "[o]ther advantages of membership include reduced rates on boat insurance, free admission to boat shows, discounts on nautical equipment and reduced rates for . . . Squadrons publications. Members also have the right to fly a United States Power Squadrons flag which identifies them as capable boaters." (465 N.Y.S.2d at p. 874.)

[8]The Second District Court of Appeal recently held that the Boy Scouts' similar extension to the youthful public of a membership invitation limited only by sex made it a "public" organization covered by the Unruh Act. (*Curran v. Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d 712, 730-733 [195 Cal.Rptr. 325, 38 A.L.R.4th 607], app. dism. (1984) 468 U.S. 1205 [82 L.Ed.2d 873, 104 S.Ct. 3574].) We reserve judgment as to whether *any* organization or entity serving a substantial segment of the public on a nonselective basis is a "business establishment" within the Act's meaning.

[9]We are not persuaded by Justice Mosk's contention that the relative smallness of the Club's membership fee makes its memberships "gratuitous," as Professor Horowitz used that term. The Club's expenses are subsidized from various private and public sources so that it may offer its facilities to the youthful population regardless of ability to pay a large fee. Moreover, while members are expected to benefit from the general social values and opportunities the Club's environment promotes, as they would from many community activities, the Club is not the selective, close-knit organization for which Professor Horowitz reserved the terms "social" and "personal."

The Club, its amici, and Justice Mosk urge that the statutory phrase "business establishments" includes only commercial or profit-seeking ventures. They point to Chief Justice Gibson's statement in *Burks, supra,* that a "business" is generally defined as a "'calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain.'" (57 Cal.2d at p. 468.) When that language is read in context, however, it provides no support for the Club's view.

The principal issue in *Burks* was whether the sale of tract homes was a "business establishment" covered by the Act. In discussing the statutory words "all," "business," "establishments," and "of every kind whatsoever," *Burks* intended only to make clear that the Act applies "without any exception and without specification of particular kinds of enterprises." (*Ibid.*) *Burks* implied, as *O'Connor* later confirmed, that the expansive phrase "all business establishments of every kind whatsoever," as it appeared in the final version of the Act, was intended to encompass many of the private groups and organizations mentioned in the original bill but removed before passage. (*Id.,* 57 Cal.2d at pp. 468-469, and fn. 3.)[10]

*Burks* did not consider whether a nonprofit enterprise might come within the Act. In *O'Connor,* however, this court subsequently found "no reason to insist that profit-seeking be a *sine qua non* for coverage under the [A]ct." The opinion held that the Act's regulation of "business establishment[s]" included a nonprofit condominium owners' association whose "businesslike" functions, including its responsibility for enforcing an arbitrary adults-only rule, were intended to protect and enhance the condominium project's economic value. (33 Cal.3d at p. 796.)

The Boys' Club insists it is further removed from the commercial world, since it collects no substantial fees from its users and has no economic function. Of course, it has some of the "businesslike attributes" noted in *O'Connor;* like the nonprofit hospital there cited as an example of a nonprofit "business establishment," the Club employs a substantial paid staff and "care[s] for an extensive physical plant" used for public purposes. (*Ibid.*)

---

[10]Indeed, when the sentence in *Burks* from which the Club and Justice Mosk draw sustenance is read in full, the breadth of Chief Justice Gibson's meaning becomes clearer. The sentence reads: "The word 'business' embraces *everything about which one can be employed,* and it is *often* synonymous with 'calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain.' [Citation.]" (Italics added.)

However, we need not rely exclusively on the Club's functional similarity to a commercial business.[11] As we have seen, the Unruh Act replaced a statute governing all "places of public accommodation or amusement" and was intended at a minimum to continue the coverage of "public accommodations." The Santa Cruz Boys' Club, as a public recreational facility, fits within that category. In these circumstances, the fact that its purposes and operations are not strictly commercial does not bar a conclusion that it is a "business establishment" to which the Act applies.[12]

The Club and its amici note that parallel California statutes banning discrimination in housing and employment—also originally adopted in 1959—contain express exemptions which refer to "association[s] or corporation[s] not organized for private profit." (See Gov. Code, §§ 12926, subd. (c), 12927, subd. (d).)[13] They urge that by excluding "nonprofit" groups from the housing and employment laws, the Legislature demonstrated its intent that the phrase "business establishments," as used in the Unruh Act, should have a strictly commercial meaning. We cannot agree. The disparate grammar of three statutes attests to their different legislative histories and purposes.

---

[11]We note, however, a recent decision interpreting Minnesota's closely analogous Human Rights Act. That statute prohibits the denial of "full and equal enjoyment . . . of a place of public accommodation because of . . . sex." (Minn. Stats. (1982) § 363.03, subd. 3.) A "public accommodation" includes any "*business . . . facility of any kind,* whether licensed or not, whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold or otherwise made available to the public." (*Id.*, § 363.01, subd. 18, italics added.) The state supreme court concluded that the Minneapolis and St. Paul chapters of the United States Jaycees, though strictly nonprofit, are public "business facilities" whose membership policies are covered by the Act. The court noted in particular that national Jaycee policy views the recruitment of unselective paid memberships as the sale of "goods" and "privileges"—in that case, leadership training and social contacts which give members an "edge" in business life. (*United States Jaycees* v. *McClure* (Minn. 1981) 305 N.W.2d 764, 768-769.) The record here discloses no such blatantly commercial approach by the Boys' Club to membership policy. Nor are the benefits of membership in the Club so closely tied to aspirations for business success. Nonetheless, the Club does extend to members, in return for their dues, the special privilege of access to its recreational facilities. It also offers paid members counseling, craft classes, and other programs designed to promote healthy development toward adulthood. In the words of our own statute, these certainly could be deemed "advantages, facilities, privileges, or services" offered by a "business establishment."

[12]*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493 [86 Cal.Rptr. 88, 468 P.2d 216] is not contrary. *Alcorn* said, "there is no indication that the Legislature intended to broaden the scope of section 51 to include discriminations other than those made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons, or customers. [Citation omitted]." (P. 500.) In context, the statement meant only that the *employer-employee* relationship was not covered by the Act, which was confined to discriminations against recipients of the "business establishment's . . . goods, services or facilities." Discrimination in services and facilities is precisely what is alleged here.

[13]At first, the two statutes were codified separately, but they have now been consolidated in the Fair Employment and Housing Act (FEHA). (Gov. Code, § 12900 et seq.)

If the specific exemption in the housing and employment laws proves anything, it is that the Legislature knows how to draft such exceptions when it wishes to. The Unruh Act covers "all" business establishments "of every kind whatsoever," and the Legislature has never added *any* exemption, exception, or restriction. We are not free to import one from another law.

Indeed, as we noted in *Marina Point,* the FEHA specifically provides that "nothing contained in this part shall be construed, *in any manner or way,* to limit or restrict the application of Section 51 of the Civil Code [i.e., the Unruh Act]." (Gov. Code, § 12993, subd. (c), italics added; see *Marina Point, supra,* 30 Cal.3d at p. 731, fn. 5.) We conclude that the fair employment and housing provisions imply no restrictions on the Unruh Act which would exempt the Club from its requirements.

It is suggested that extension of the Unruh Act to the Boys' Club will threaten all private organizations which traditionally serve the special cultural or charitable needs of particular minority groups with common interests. But we have emphasized that the Club's status as a "business establishment" covered by the act arises from its "public" nature; it offers basic recreational facilities to a *broad segment* of the population, *excluding* only a *particular* group expressly recognized by the Act as a traditional target of discrimination.[14]

■ Finally, and belatedly, the Club contends that forcing female participation in its activities would interfere with its current members' rights of association guaranteed by the state and federal Constitutions. The United States Supreme Court has recently rejected the identical argument in a similar context. In *Roberts* v. *United States Jaycees* (1984) 468 U.S. 609 [82 L.Ed.2d 462, 104 S.Ct. 3244], the court ruled that First Amendment associational rights do not prevent application of the Minnesota Human Rights Act to prohibit sex-segregated membership policies by the Jaycees. (See fn. 8, *ante.*)

---

[14]In a similar vein, Justice Mosk complains that our interpretation threatens many traditionally sex-segregated institutions, such as fraternities and sororities, private schools, and scouting organizations. Nothing we have said compels that result. The Act covers "business establishments" of every kind, and these include traditional "public accommodations." Yet we have emphasized that the statute does not govern relationships which are truly private—to paraphrase Horowitz' words, those which are "continuous, personal, and social" (33 So.Cal.L.Rev. at p. 281) and take place more or less outside "public view." (*Id.,* at pp. 287, 289.) "Private" groups and institutions do not fall prey to the Act simply because they operate "nongratuitous" residential or recreational facilities for their members or participants; an "accommodation" must be "public" to be covered. Conversely, we have stressed that the statute was intended to include those kinds of recreational *facilities* traditionally deemed "accommodations." We have not suggested that noncommercial groups which do not operate such facilities are covered "business establishments." We simply affirm the trial court's conclusion that the Boys' Club of Santa Cruz in particular operates "accommodations" which are "public" in nature.

*Roberts* acknowledged that the Constitution protects both "intimate" and "expressive" associational rights. (468 U.S. at p. 618 [82 L.Ed.2d at p. 471].) However, it found no unconstitutional infringement of either of these separate interests.

The court quickly dismissed the claim that the Jaycees' membership rules involved rights of "intimate" association. It noted that the Jaycees' character as a large, socially unselective membership institution places it "outside the category of relationships" to which the individual right of personal choice applies. (*Id.*, at p. 621 [82 L.Ed.2d at pp. 473-474].) The same is true of the Boys' Club, as we have seen.

The Jaycees also argued in *Roberts* that their rights of "expressive" association would be infringed by forced admission of women, since the organization's cohesive purpose and creed was to promote the special views and interests of young men. The court disagreed, though it conceded, as the court of appeals had noted, that a "'not insubstantial part' of the Jaycees' activities constitutes protected expression on political, economic, cultural, and social affairs." (*Id.*, at p. 626 [82 L.Ed.2d at pp. 477-478].) The Minnesota law, the court observed, was not aimed at protected speech, and it imposed no direct restraint on the Jaycees' freedom to express their views.

On the other hand, the statute's protection of equal access rights, said the court, was the least intrusive means of satisfying a compelling state interest—the redress of historical discrimination against full participation by women in political, economic, and cultural life. (*Id.*, at pp. 627-628 [82 L.Ed.2d at p. 478].) The court refused to entertain unproven assumptions, based on stereotypes, that participation of women would substantially alter the expressive character of the Jaycees. (*Ibid.*)

The Boys' Club, though it purports to focus on the particular needs of male youth, does not suggest that it is substantially engaged in protected "expression of views." In any event, our construction of the Unruh Act intrudes no further, and for no less compelling purpose, than was the case in *Roberts*. No federal constitutional violation is shown.

We reach a similar conclusion under California's Constitution, though we recognize it affords greater privacy, expressive, and associational rights in some cases than its federal counterpart. (Cal. Const., art. I, §§ 1, 2; see *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123, 130, fn. 3 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219]; *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 908 [153 Cal.Rptr. 854, 592 P.2d 341] affd. (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035].) Considering this state's special constitutional sensitivity to sexual discrimination

(see *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, 600 [150 Cal.Rptr. 435, 586 P.2d 916]; *Sail'er Inn* v. *Kirby* (1971) 5 Cal.3d 1, 17 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]), we see no basis to hold that a statutory requirement of equal access to the recreational facilities of a public, nonselective, nonexpressive community service organization offends rights guaranteed by the California charter. We decline to do so.

2. *The Boys' Club's male-only membership policy is prohibited by the Unruh Act.*

██  The Club next argues that, even if it is a covered "business establishment," its "traditional" membership policy is "reasonable" and therefore permitted by the Act. Justice Kaus also urges that view. Under the facts of this case, we cannot accept the contention.

██  The Unruh Act accords every person an individual right against "arbitrary" discrimination of any kind, whether or not set forth expressly in the statute. (*Marina Point, supra,* 30 Cal.3d 721, 732, quoting *Cox, supra,* 3 Cal.3d at p. 216.) Plaintiffs suggest that by condemning in particular those discriminations based on sex, race, color, religion, ancestry, and national origin, the Legislature deemed them arbitrary and unreasonable per se.

Plaintiffs find support for this view in the legislative history of the 1974 amendment to the Act, which added a specific reference to sexual discrimination. (Stats. 1974, ch. 1193, § 1, p. 2568.) Intermediate versions of the amending bill, they note, proposed to ban "*arbitrary* discrimination . . . on account of sex" (italics added), but the modifying phrase was deleted from the final statute. Plaintiffs also emphasize the Legislative Counsel's view that the addition of sex to the Act would not extend its reach, since sexual discrimination would probably be considered a form of arbitrary discrimination already prohibited. (See discussion, *post.*)

After examining the history of the 1974 amendment in *Marina Point,* this court affirmed the *Cox* rule that the Act's "identification of particular bases of discrimination . . . is illustrative rather than restrictive." (See 3 Cal.3d at p. 216.) The *Marina Point* opinion emphasized a letter to Governor Reagan from Senator Petris, Chairman of the Select Committee on Housing and Urban Affairs and also the author of the 1974 bill. (30 Cal.3d at p. 734.) Urging the Governor's signature on the sex amendment, Senator Petris explained: "The purpose of the bill is to bring it to the attention of the legal profession that the Unruh Act provides a remedy against *arbitrary* discrimination against women (or against men) in public accommodations which are business enterprises. This *bill* does not bring such discrimination under

the Unruh Act, because that Act has been interpreted as making *all* arbitrary discrimination illegal, on whatever basis. *The listing of possible bases of discrimination has no legal effect,* but is merely illustrative." (Second and third italics in original.) If the last quoted sentence is true, the mere fact that sex is listed as a prohibited ground of discrimination does not give it a special "arbitrary per se" status, as plaintiffs suggest.

Official comments by other persons and agencies involved in passage of the 1974 amendment do not appreciably advance plaintiffs' argument. The most complete analysis is that of the Legislative Counsel, included by Senator Petris with his letter to the Governor. This report took mutually contradictory views of the Act and the proposed amendment. First, it noted that, under *Cox,* the listed bases of discrimination are "illustration[s] of what [constitute] arbitrary discrimination." Hence, it said, the bill "would not extend the application of the Unruh Civil Rights Act under existing case law," since "discrimination based solely on sex would [probably] be considered arbitrary" even without addition of that word to the statute.

The Legislative Counsel cautioned, however, that "a construction of the act that would prohibit discrimination on any of the grounds enumerated therein *whether or not such action was arbitrary* would lead to absurd results." (Italics added.) Noted in particular was the opposition mounted against the 1974 amendment by those who feared it would prohibit sex-segregated dormitories, institutional housing, and residence hotels. Such distinctions, the Legislative Counsel speculated, could probably be justified under both existing law and the proposed amendment as not based "solely" on sex. (See also Sen. Com. on Judiciary, Digest of Sen. Bill No. 1380 (Aug. 13, 1974) p. 2.) This confusing appraisal is scant evidence of a legislative intent to alter *Cox's* determination that the identified bases of discrimination in the Act merely illustrate what may constitute arbitrary discrimination. Accordingly, we affirm that holding.[15]

▇ In *Marina Point,* the court discussed the nature of arbitrary discrimination. Though one may be excluded from a "business establishment" on an individual basis "if he conducts himself improperly or disrupts the operations of the enterprise," it is "arbitrary," and therefore prohibited, to exclude *an entire class* on the basis of stereotyped notions. (30 Cal.3d at pp. 738-739; see *Cox, supra,* 3 Cal.3d at pp. 217-218.)

*Marina Point* left open the possibility, however, that the Act might allow the exclusion of an entire class whose presence "basically [would] not ac-

---

[15]Of course, discrimination against a racial minority is always invidious, and where such discrimination is prohibited, it is prohibited absolutely.

cord with the nature of [the] business enterprise and of the facilities provided." (30 Cal.3d at p. 741.) Specifically, it suggested that limitation of access to members of certain groups might operate in certain cases "as a reasonable and permissible means under the Unruh Act of establishing and preserving *specialized facilities* for those *particularly in need* of such services or environment. [Citation and fn. omitted.]" (Italics added.) An example was housing facilities reserved for the elderly, which by design and function served the unique physical, social, and psychological needs of this minority group. (*Id.,* at pp. 742-743.)

The court suggested that the "social need" served by such a "specialized institution" must be well-documented and established as a matter of public policy. The case for "specialization" is strengthened if the facility was designed to satisfy the particular concerns and characteristics of the needy group, making it less suitable for general use. (*Ibid.*)

The Marina Point complex, the opinion said, could not qualify under those standards. As designed, it was suitable for children; indeed, the adults-only policy was of recent vintage. Moreover, compared to the special housing needs of the elderly, the preference of some childless adults to live away from children was not a "similarly compelling societal interest."[16] In fact, the no-children rule exacerbated a more serious social problem than it purported to alleviate, since there is considerable evidence that families with small children have particular trouble finding affordable housing. (*Ibid.*)

Nonetheless, the Club argues here that it falls within the *Marina Point* exception as a "specialized facility" designed and operated solely to serve the particular "social needs" of boys. But the Club has failed to make the showing on this issue that *Marina Point* demands. There is no indication that the crafts, games, counseling programs, and recreational facilities offered by the Club are suited or safe only for males. Indeed, plaintiffs seek admission to membership because of their interest in using those programs and facilities. (See *National Org. for W., Essex Ch., supra,* 318 A.2d at pp. 38-39.)[17]

The Club contends that its primary purpose—to combat delinquency—is an important social interest best served by concentrating on male youth. It

[16]Seizing on this phrase in *Marina Point,* a Ninth Circuit panel has recently concluded that "blanket exclusion" of a particular class, such as women, from a "business establishment" covered by the Unruh Act can only be justified by a "compelling" social concern. (*Martin* v. *International Olympic Committee* (1984) 740 F.2d 670, 677; see also *Koire* v. *Metro Car Wash* (1985) *ante,* pp. 24, 38 [216 Cal.Rptr. 133, 707 P.2d 195].) We need not decide whether this is the precise semantic definition of the *Marina Point* test, since the Club has not proven, as *Marina Point* certainly requires, that its all-male policy directly ameliorates a well-documented need and aids a well-established public policy. (See discussion, *post.*)

[17]A member of the Club's staff testified that any necessary rearranging of restroom and dressing facilities would not be a major problem.

introduced juvenile hall statistics suggesting that Santa Cruz boys are four times more likely than their female counterparts to get into trouble with the law. By extending service to girls, the Club urges, it will have to dilute its efforts with boys, who present the greater social problem.[18]

It was conceded, however, that delinquency affects substantial numbers of girls. There was no evidence that boys need the recreation offered by the Club more than girls, that a sex-segregated "drop-in" recreational facility is more effective in combating juvenile delinquency than one open to both sexes, or that extension of membership to girls would cause an impractical net increase (or decrease) in membership.[19]

■ Most fundamentally, the Club argues that it nonetheless has the absolute right to choose to focus on the needs of boys alone. Again, the analogy is drawn to the many organizations which limit their services and programs to particular minority subgroups. As we have seen, however, noncommercial organizations open *only* to such well-defined subgroups are not "public accommodations" and thus may not be "business establishments" covered by the Act. Here, by contrast, the Club will admit without distinction fully half the youthful population of Santa Cruz. The sole group excluded, though not numerically a minority, has been a traditional target of discrimination.[20]

The effect of this policy in Santa Cruz is to deny the excluded group, and that group alone, access to recreational opportunities available nowhere else

---

[18]There was testimony that the current "drop-in" policy of the Club would have to be altered, and a system of specific hours for specific groups instituted, if membership rose much above the current fairly stable figure of 1,200.

[19]Amicus Tustin Boys' Club suggests that, because of their "macho" culture, Latino boys from high-delinquency neighborhoods might refuse to attend a Club which admitted girls as members. On this record, that is bare conjecture. There is no evidence that the Santa Cruz facility has such cultural or demographic problems.

Nor can we accept Justice Kaus' suggestion that the Club has obeyed the Act because its decision to devote its resources to the greater delinquency problem it perceives among male youth was "rational" and taken in "good faith." *Marina Point* made clear that "reason" and "good faith" are not enough to avoid a finding of "arbitrary" discrimination. Our opinion condemned the adults-only policy there at issue even to the extent it rested on *true* assumptions about the general difficulties of living with children. (30 Cal.3d at pp. 736-740.) There are any number of plausible reasons why the owner of a "business establishment" serving the public might wish, in good faith, to exclude or discriminate against a particular group. But the Legislature has decreed that, once a "business establishment" attains that public status, it has responsibilities to the entire community which cannot be lightly ignored. Were good faith and bare rationality sufficient to permit group discrimination, the Act would have little meaning.

[20]For this reason, recent cases have suggested that sex is a "suspect classification" for purposes of constitutional analysis. (*Sail'er Inn, Inc., supra,* 5 Cal.3d at pp. 17-20; see *Frontiero* v. *Richardson* (1973) 411 U.S. 677, 688 [36 L.Ed.2d 583, 592-593, 93 S.Ct. 1764] [opn. of Brennan, J.].) Though sexual discrimination is not arbitrary per se under the Unruh Act (see discussion, *ante*), the 1974 addition of "sex" to the Act's list of prohibited discriminations was intended to highlight the problems of inequality traditionally faced by girls and women. (See discussion, *ante*.)

in the vicinity. Thus, as was true of Marina Point, the Club may be creating a more compelling social problem than the one it seeks to alleviate.

 ■■■   Even the Club's argument that it traditionally serves only boys can no longer be sustained. There was undisputed evidence that a number of local Clubs, including several in California, have admitted girls with no untoward effects.[21] Under these circumstances, we cannot conclude that the Club is a "specialized facility" entitled, despite the broad proscription of the Unruh Act, to deny access to girls.

The Club suggests that its funding is in jeopardy if its membership policies change. But the trial court found on substantial evidence that the original Mallery Trust, the Club's major financial source, is unrestricted on that score. We recognize with concern that the Mallery's 1978 gift of $200,000 is conditioned on continuation of the male-only policy. But admission of girls may well produce offsetting new revenue sources. There is no evidence of severe, permanent financial danger should the Club be forced to comply with the Act. In sum, this record provides no basis for an exception to the Act's rule against arbitrary discrimination by "business establishments."

---

[21]The Club contends that its single-sex membership policy, like housing for the elderly, serves public policy, since it has won legislative approval at both the state and national level. It suggests that prohibition of that policy under the Unruh Act would violate the supremacy clause. At the least, it urges, legislative approval of the Club's practices in other contexts goes against the notion that the Unruh Act was intended to alter them.

The Club points out that the national organization's "purpose," as stated in its congressional charter (36 U.S.C.A. § 691 et seq.), is "to promote the health, social, educational, vocational, and character development *of boys* . . . ." (*Id.,* § 693, italics added.) We find no preemptive purpose in that phrase. State remedial legislation is preempted only if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," and the congressional intent to preempt must be "unambiguous." (*Perez* v. *Campbell* (1971) 402 U.S. 637, 649-650 [29 L.Ed.2d 233, 242, 91 S.Ct. 1704]; *Florida Avocado Growers* v. *Paul* (1963) 373 U.S. 132, 146-147 [10 L.Ed.2d 248, 259, 83 S.Ct. 1210].) Here, the charter itself provides that the Club has power "to adopt, amend, and alter a constitution and bylaws *not inconsistent* with the laws of the United States *or any State in which the corporation is to operate,* . . ." (36 U.S.C.A. § 694(5), italics added.) Its reference to boys seems more a passive recognition of the Club's then traditional character than a statement of affirmative congressional purpose to exclude girls. (See *National Org. for W., Essex Ch.* v. *Little L. Base., Inc., supra,* 318 A.2d 33, 39-41.) According to the evidence, a number of local clubs have admitted girls, and the trial court found that this change in policy does not violate the national charter.

As the Club notes, federal law also specifically permits tax-exempt "voluntary youth service organizations" which traditionally serve one sex only to receive Education Act funds despite their policy of sex discrimination. (20 U.S.C.A. § 1681(a)(6)(B).) That provision is consistent with general federal "public accommodations" policy, which, unlike California's, does not prohibit gender-based discrimination. (See fn. 3, *ante.*) The federal choice not to do so does not preclude this state from more stringent regulation.

Finally, the Club emphasizes a California statute permitting use of public school property by community organizations, including the Camp Fire Girls and the Boy Scouts. (Ed. Code, § 40041, subd. (a).) Nothing in that provision reflects an intent to approve sex discrimination by a monopolistic local recreational facility otherwise open to the youthful public.

## Conclusion

We have decided that the Boys' Club of Santa Cruz is a "business establishment" covered by the Unruh Act, and that its male-only membership policy is an arbitrary form of discrimination prohibited by that statute. In our view, these conclusions are compelled by the Legislature's very broad antidiscrimination policy. We caution again, however, that our holding is based on the particular nature and function of the Club. Nothing we say necessarily requires a similar result in the case of other single-sex youth organizations. Nor may we foreclose the Legislature from a more precise formulation of the situations in which private discrimination is forbidden.

Both dissenting opinions focus upon the question of sex discrimination, blithely ignoring the significance of the question presented here upon discrimination of other sorts. Under the dissenters' view, organizations such as appellant would be free to exclude members on the basis of race, or national ancestry, as well. Justice Poché, dissenting in the Court of Appeal, made a pertinent observation in that regard: "Perhaps the violation would be clearer if the Boys' Club of Santa Cruz had discriminated on the basis of race, not sex. But that lack of clarity is not the fault of the language of the statute. Instead, the difficulty is the long and well-ingrained tradition of women's dependency which even today causes statutory recognition of the equality of women to have a strange and unreal ring to it."

The judgment is affirmed.

Broussard, J., Reynoso, J., and Chesney, J.,* concurred.

**BIRD, C. J.**—I concur.

Justice Poché wrote an excellent dissenting opinion in the Court of Appeal. In most respects, his analysis was identical to that of today's lead opinion. Indeed, this court granted a hearing largely due to the persuasive force of Justice Poché's arguments. The inevitable but unfortunate consequence was to wipe out the published record of his excellent contribution.

It is worthwhile to reproduce here selected passages from Justice Poché's opinion. Their value extends beyond historical interest. In these passages, Justice Poché pinpointed the wider implications of this case. In the process, he offered a forceful refutation of the views expressed by today's dissenters, particularly Justice Mosk.

*Assigned by the Chairperson of the Judicial Council.

Justice Poché recognized that much more is at stake here than the fate of sex-segregated children's swimming pools. The reasoning of the vacated majority opinion in the Court of Appeal below—like that in Justice Mosk's dissent here—would exclude "the Boys' Club of Santa Cruz and therefore most nonprofit charitable service organizations from the operation of the Unruh Civil Rights Act (Civil Code, § 51.) What this means is that services such as the Salvation Army lunch line or free legal advice offered by nonprofit law offices may be restricted on the basis of race, sex, religion, or any other arbitrary classification. [Fn. omitted.]"

In terms which apply with equal force to Justice Mosk's dissent, Justice Poché criticized the vacated Court of Appeal opinion as a source of two convenient guidelines for "those who wish to engage in arbitrary discrimination without running afoul of the Unruh Civil Rights Act: (1) nonprofit volunteer, fraternal, sectarian, charitable or cultural organizations are not within the ambit of the statute; and (2) a business-like purpose cannot be found if such a nonprofit group is merely offering programs and facilities for a nominal fee to its members.

"The first test allows the Ku Klux Klan or neo-Nazis to engage in the nonprofit, volunteer and fraternal offering of athletic facilities to some white children to combat the rise in juvenile delinquency. I find it difficult to believe that was or is the legislative intent behind the Unruh Civil Rights Act.

"The second touchstone seems to center upon whether the fee is nominal. Thus the wealthy organization which can afford to discriminate will be allowed to do so. But only those clubs which like the Boys' Club of Santa Cruz have wealthy patrons who prefer to confer largess in a sexually discriminatory fashion will be free . . . to discriminate. Unless we are to presume that the Unruh Civil Rights Act was meant to insulate a select few from the 20th century, it is impossible in my judgment to come to [that] interpretation of the statute . . . .

"The trial court understood the clear meaning of the Unruh Civil Rights Act: community services regardless of their source are to be provided in accordance with the legislative mandate of equal treatment for all. Perhaps the violation would be clearer if the Boys' Club of Santa Cruz had discriminated on the basis of race, not sex. But that lack of clarity is not the fault of the language of the statute. Instead, the difficulty is the long and well ingrained tradition of women's dependency which even today causes statutory recognition of the equality of women to have a strange and unreal ring to it."

On the basis of my full concurrence with these remarks, I agree that the judgment should be affirmed.

**MOSK, J.**—I dissent.

The incredible concept that a private, charitably funded recreational club for boys cannot be allowed to exist as such because it is a "business establishment" would be an irresistible subject for ridicule and humor if it were not so serious in its impact. The majority opinion conjures up visions of young boys, who have been skinny-dipping in their club pool, donning three-piece suits to attend the board meeting of their "business establishment" where they may discuss such matters as the antitrust implications of a proposed takeover of girl scout cookies. Precocious indeed these teen and preteen youngsters must be.

Growing up into a world of sex equality is inevitable for all children, but the court-ordered elimination of traditional childhood activity is an exorbitant price to pay for accelerating the process.

The majority purport to be blithely oblivious to the extended reach of their decision, and disingenuously attempt to restrict their opinion to this one case, involving only this one Boys' Club in this one city. At the same time they appear to implore the Legislature to rescue society from this judicial folly and its consequences. (Maj. opn., *ante,* at pp. 77 and 91.) That is a plea I can enthusiastically endorse.

That the ultimate result of this case will strain our social fabric and send shock waves throughout the realm of children's organizations is made clear by the appearance of numerous apprehensive amici curiae representing both girls and boys. Girls' organizations throughout California are no more eager for an invasion by boys than are boys' groups for dilution of their programs by compulsory inclusion of girls. Briefs on behalf of the Santa Cruz club have been filed by the Boy Scouts of America, Girl Scout Councils of California, United Way of America, the Girls' Club of Vista, and the Boys' Clubs of Tustin, Vista, Oceanside, Chula Vista, Buena Park, Rio Hondo, Pasadena, Whittier, San Francisco, National City, Santa Clara County, Oakland, Santa Ana, and the San Dieguito Boys' and Girls' Clubs and Fallbrook Boys' and Girls' Clubs.

The majority's insouciance is disturbing. No girl's parents who are inclined to be litigious will fail to use this case as authority to demand their daughter's admission to other boys' clubs, the Boy Scouts, Cub Scouts, Young Men's Christian Association, and similar organizations that maintain camps or physical facilities. Conversely, boys could rely on this case to

insist on their right to join girls' clubs, the Girl Scouts, Campfire Girls, Young Women's Christian Association, and like groups. There is no rational way to distinguish those situations.

In addition, the majority strike a death knell for fraternities and sororities as they exist on every college campus in California. There is-no way any court can read the rationale of the majority opinion and yet deny the right of a male student to join a sorority, or a female student to become a fraternity member. If the Boys' Club of Santa Cruz is a business because it operates a gymnasium and swimming pool, a fortiori sororities and fraternities, which provide and charge for housing accommodations and eating facilities, are business establishments. Similar considerations will probably also affect separate college dormitories.

The natural extension of the majority opinion to women's colleges is even more potentially devastating. If a qualified male student seeks admission to Mills, Mount St. Mary's or Scripps—California's renowned educational institutions for women—there is no rational way in which a court could distinguish his demand from that of the plaintiff herein. Colleges that provide not only classes but living accommodations and food service are arguably more akin to a business establishment than is a recreational boys' club.

As is inevitable, the majority have considerable difficulty with legislative history. The original version of the measure that ultimately came to be known as the Unruh Act was expansive. It extended to "all public or private groups, organizations, associations, business establishments, schools and public facilities. . . ." (Assem. Bill No. 594 (1959 Reg. Sess.), as introduced Jan. 21, 1959.) By means of amendment, however, all groups other than "business establishments" were eliminated. Specifically stricken was reference to "private groups" and "associations."

From the foregoing, the majority with amazing dexterity reach the conclusion that by limiting the scope of the act to the one remaining category—business establishments—the Legislature somehow intended to embrace all the eliminated categories. This is comparable to insisting that when the states repealed the 18th Amendment they intended to retain prohibition. As stated in *Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 607 [45 Cal.Rptr. 512]: "The rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision." (Accord, *Madrid* v. *Justice Court* (1975) 52 Cal.App.3d 819, 825 [125 Cal.Rptr. 348].)

There is a simple answer to the plaintiff's contention about legislative intent. If the Legislature really meant that the Unruh Act applies to chari-

table and noncommercial enterprises like boys' clubs and intended to simplify the act, it would not have used the word "business" in the statute; "establishment" would have sufficed.

As this court declared in *In re Cox* (1970) 3 Cal.3d 205, 215 [90 Cal.Rptr. 24, 474 P.2d 992], we must presume the Legislature is aware of our decisions. Thus when over the years the Legislature retained the coupling of "business" and "establishment," it obviously did so in deference to the definition given to "business" by Chief Justice Gibson in *Burks* v. *Poppy Construction Co.* (1962) 57 Cal.2d 463, 468 [20 Cal.Rptr. 609, 370 P.2d 313]: "The word 'business' embraces everything about which one can be employed, and it is often synonymous with 'calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain.'" It is obvious to the boys at the club, as it should be to my colleagues, that the Boys' Club is not operated "for the purpose of making a livelihood or gain."

Professor Horowitz in his law review article on the meaning of "business establishments" declared that they are entities which enter into nongratuitous relationships with other persons, those relationships being relatively noncontinuous, nonpersonal and nonsocial. (Horowitz, *The 1959 California Equal Rights in "Business Establishments" Statute* (1960) 33 So.Cal.L.Rev. 260, 289.) Services and facilities are provided by the Boys' Club for a nominal nonprofit fee of $3.25 per year; the relationship between the Boys' Club and its members is essentially gratuitous. The purpose of the Boys' Club—to help boys develop citizenship, leadership, values, health and fitness, personal adjustment and individual growth, and intergroup understanding—is primarily to provide services of a personal and social nature, and the relationship between the Boys' Club and its members is clearly noncommercial. Finally, boys may remain members for years; the relationship is thus continuous.

My colleagues did not need to strain to the point of reductio ad absurdum to prove judicial devotion to principles of sexual equality in business establishments. This court's record has been clear. Long before any of the present majority were on the court, we insisted on the right of women to be accorded equal treatment in the business world. In *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 20 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351], a unanimous court held sex classifications to be suspect, particularly in business and employment. The Legislature has been consistent with us in this area, and also spoke in terms of "business establishments" as distinguished from nonprofit community service organizations.

A different view was taken in a recent federal case. In *Martin* v. *International Olympics Committee* (9th Cir. 1984) 740 F.2d 670, 82 women

athletes experienced in 5,000 and 10,000 meter track races sought the right to compete in the 1984 Olympics in Los Angeles. The federal court, conceding that the sporting event has become a "business establishment," nevertheless found no violation of the Unruh Act or related statutes in "the male-oriented approach taken in the Olympics from its modern-day inception." (See also *O'Connor* v. *Board of Educ. of School Dist. 23* (N.D.Ill. 1982) 545 F.Supp. 376 [girl not permitted on boys' basketball team]; *Forte* v. *Board of Ed., North Babylon, etc.* (1980) 105 Misc.2d 36 [431 N.Y.S.2d 321] [boy not permitted on girls' basketball team].)

The recent United States Supreme Court opinion involving Minnesota Jaycees is helpful, but clearly not to these plaintiffs. (*Roberts* v. *United States Jaycees* (1984) 468 U.S. 609 [82 L.Ed.2d 462, 104 S.Ct. 3244].) The majority reiterated their devotion to the principle of protecting organizations of persons with shared ideals and beliefs from unwarranted state interference. Whether an organization is entitled to constitutional protection from incursion by the state depends upon such factors as its "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." (*Id.*, at p. 620 [82 L.Ed.2d at p. 473, 104 S.Ct. at p. 3251].)

In finding that the Jaycees were subject to state-imposed sex restrictions, the court relied upon the criteria used by Minnesota courts: the organization's size, selectivity, *commercial nature* and use of public facilities. It specifically drew a distinction between the Jaycees and such community groups as Kiwanis clubs. And if there were any question as to the limited reach of the Supreme Court opinion, in its conclusion it recognized the state courts' "articulated willingness to adopt limiting constructions that would *exclude private groups from the statute's reach.*" (Italics added, *id.*, at pp. 630-631 [82 L.Ed.2d at p. 480, 104 S.Ct. at p. 3256].)

Justice Sandra O'Connor's concurring opinion is particularly instructive. She emphasized (at p. 632 [82 L.Ed.2d at p. 481, 104 S.Ct. at p. 3257]) the goal of ensuring "nondiscriminatory access to commercial opportunities in our society." She declared (at p. 632 [82 L.Ed.2d at pp. 483-484, 104 S.Ct. at pp. 3259-3260]) that organizations engaged in commercial activity—such as the Jaycees—have only limited protection from governmental restrictions, in contrast to those groups engaged in "the training of outdoor survival skills or participating in community service [which] might become expressive when the activity is intended to develop good morals, reverence, patriotism and a desire for self-improvement." It is significant that she cited as examples of the latter the activities of boy scouts and girl scouts.

From *Roberts* one gleans that organizations such as the Jaycees that foster the commercial benefits of its members may be regulated by government,

but that others enjoy "a substantial measure of sanctuary from unjustified interference by the State." It is ludicrous to contend that the Boys Club of Santa Cruz is engaged in commercial activity.

The effects, tangible and intangible, of the majority opinion in this case are devastating.

First, the club will be required to compel joint use of facilities by boys and girls—swimming, basketball, handball, etc. In the alternative, the club will be required to cut the boys' recreational time in half and restrict their hours in order to accommodate girls: e.g., not a full day on Saturday but only a half day; not two hours after school but only one hour.

Second, the club will be compelled to build an additional locker room, showers, toilets and other physical facilities. This, of course, will require a considerable expenditure of charitable funds.

Third, while being thus obligated to expand, the club will simultaneously lose a $200,000 gift that is conditioned on a male-only policy. The majority gratuitously declare that the admission of girls "may well produce offsetting new revenue sources." I doubt that my colleagues would enjoy serving on a fund-raising committee seeking to raise a $200,000 "offset" for this purpose in the Santa Cruz community.

Fourth, the majority effectively stifle any community incentive to create and construct a girls' club comparable to the Boys' Club.

Fifth, the Boys' Club may very well lose its national charter. By act of Congress, the Boys' Clubs of America are authorized "to promote the health, social, educational, vocational, and character development of boys throughout the United States of America. . . ." (36 U.S.C.A. § 693.) Parenthetically, it may be observed that Congress has chartered other sex-exclusive organizations, e.g., Daughters of the American Revolution (36 U.S.C.A. §§ 18-18c), Sons of the American Revolution (36 U.S.C.A. §§ 20a-20g), and Veterans of Foreign Wars of the United States (36 U.S.C.A. §§ 111-120).

Amicus Boy Scouts of America points out other significant policy considerations overlooked by the majority. By protecting the freedom to base sexual associations on personal affinities, society promotes its pluralism, with all the values that connotes—values such as a diversity of views, a variety of ideas, and preservation of traditions. Here, the plaintiff and her supporters believe that their community will benefit by making certain private facilities with limited capacity and with limited adult supervision avail-

able either to children of both sexes or to none at all. Other citizens—those who charitably donated the property and those who charitably maintain it—believe their community will benefit by more narrowly focusing the use of that property on boys, many of whom are disadvantaged.

The value of a pluralistic, democratic society is that it permits members of each group to join with others sharing their views, to pool their resources as they wish, to seek the resources of new members, and to experiment to try to prove the validity of their respective concepts. The charitable donors of the Boys' Club property and funds, and the volunteers who charitably organize and operate the club, have done just that. No law or policy bars plaintiff and others from seeking out charitable contributors who share their views. Their unwillingness to look for or inability to find such contributors does not justify imposing a judicial compulsion on the existing charitable group to change its own views and policies.

Another important factor that the majority have ignored is the policy favoring private charitable contributions, a policy manifested in tax laws and laws authorizing charitable contributions. Citizens often, perhaps almost always, charitably contribute to organizations that promote or implement goals the contributors believe to be beneficial and worthy of support. The more the state arbitrarily dictates the permissible goals and practices of charitable organizations, the tighter the pursestrings of potential donors are likely to be drawn.

For all of the foregoing reasons I would reverse the judgment.

**KAUS, J.,**\* Dissenting.—Although the majority's conclusion that the Santa Cruz Boys' Club (Club) is a "business establishment" is by no means compelling (see Comment, *The Unruh Civil Rights Act: An Uncertain Guarantee* (1983) 31 UCLA L.Rev. 443), I concede, at least for the sake of argument, that facilities such as the Club are, prima facie, covered by section 51. Were it otherwise, the Club could discriminate on bases—e.g. race—which would never pass muster under the test we laid down in *In re Cox* (1970) 3 Cal.3d 205, 217 [90 Cal.Rptr. 24, 474 P.2d 992]. Nevertheless I believe that the majority is tragically mistaken in holding that the exclusion of girls is unreasonable and arbitrary and, therefore, in violation of the statute.

Before stating my reasons, I feel compelled to express puzzlement at the majority's repeated mention of the fact that there is no comparable facility

---

\*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

for girls in the Santa Cruz area.[1] If there were a Girls' Club in Santa Cruz, would the majority be satisfied with "separate but equal" facilities? If there were two boys' clubs, would each have to admit girls? Two boys' clubs and one girls' club? Unless the majority is prepared to suggest that the existence of additional facilities might affect its conclusions, I respectfully submit that the references to the Club's monopoly are of no legal significance.

To get down to business: at the outset of its opinion the majority states that its analysis does not "necessarily" apply to (1) organizations which operate facilities not generally open to the public, or (2) organizations which can demonstrate a compelling need to maintain single-sex facilities. I submit that if these disavowals are sincere, the majority has reached the wrong result for two independent reasons.

To establish that the Club is a facility that is generally open to the public, the majority states that it "offers basic recreational facilities to a *broad segment* of the population, *excluding* only a *particular* group expressly recognized by the Act as a traditional target of discrimination." (*Ante,* p. 84.) (Italics in original.) Sounds good, but what are the facts? The "broad segment" of the population consists of boys between the ages of eight and eighteen. On the other hand, the "particular" group which is excluded is the rest of humanity. I submit that the only way to reach the conclusion that the Club is "generally open to the public" is to look at the included and excluded groups through different ends of a telescope.

Further, I believe that the Club has demonstrated "a compelling need to maintain single-sex facilities." The majority quite properly holds that section 51 only forbids arbitrary sex discrimination. One would think, then, that if one of the main goals of the Club is the control of juvenile delinquency and those who guide its affairs have made a reasoned decision that this goal is best advanced by a prophylactic application of the Club's limited resources to that group of youngsters from which the majority of serious delinquents seems to come—boys—that is surely not arbitrary. Yet all that the trial court had to say on the subject was to conclude, erroneously, that "[d]iscrimination on the basis of sex is per se illegal under [section 51]" adding, however, that even if the act "prohibited only arbitrary discrimination on the basis of sex, defendants have arbitrarily discriminated against plaintiffs . . . ." No reason was given why it is arbitrary to spend the de-

---

[1] "No single program or facility open to girls offers a similar range of activities at similar cost." (*Ante,* p. 77.) "The effect of this policy in Santa Cruz is to deny the excluded group . . . access to recreational opportunities available nowhere else in the vicinity." (*Id.* at p. 89.)

linquency prevention dollar where it is thought to do the most good.[2] Of course, if those who guide the Club's fortunes could predict with some degree of accuracy which particular individuals—girls as well as boys—were headed for a life of crime, it would obviously not do to classify boys as a group as potentially more delinquent than girls. No one, however, ascribes such clairvoyance to defendants.[3]

The majority seeks to improve on the trial court's *ipse dixit* by asserting that because some delinquents are girls, the Club should have proved that "a sex-segregated . . . facility is more effective in combating juvenile delinquency than one open to both sexes, . . ." Why did the Club have a burden in that respect? If it acted in good faith—and no one claims that it did not—why should it have to prove that a perfectly defensible decision on how to spend its resources has actually proved to be the most effective one? Is a reasonable decision, rationally related to the services and facilities of the Club—the test of *Cox, supra,* 3 Cal.3d 205—not reasonable unless proved to be the best solution to the problem under attack?

For obvious reasons the majority admits that there are certain activities which even section 51 permits to be carried on in sex-segregated fashion. The real problem is the extent of this immunity from the reach of section 51. Evidently those responsible for the Club's policy have decided that it is beneficial for boys to have some time when they do not have to adjust their behavior to the presence of girls. There is, of course, a vast professional literature on the subject.[4] Who are we to say that it is unreasonable for the

---

[2] In *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 736-740 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161], we dealt with the problems of apartment landlords seeking to secure their tenants' tranquility by keeping out all minors because, as a class, kids are noisier, rowdier and more mischievous. We condemned such class discrimination, recognizing, of course, landlords had "broad authority to protect their enterprises from improper and disruptive behavior" by excluding "those persons who are in fact disruptive." The situation with respect to prevention of juvenile delinquency is, of course, not at all analogous. By the time a youngster has become a delinquent the Boys' Club program of prevention has already failed.

[3] I do not claim that the same considerations would be valid if, for example, statistics showed that members of a particular racial group or religion were more prone to turn delinquent. Some suspect classifications are simply more suspect than others and demand greater degrees of justification. (*Ante,* p. 87, fn. 15; see also *Michael M.* v. *Sonoma County Superior Court* (1981) 450 U.S. 464, 469 [67 L.Ed.2d 437, 442, 101 S.Ct. 1200, 1204].)

[4] I quote just by way of example from Lyles, *Grouping by Sex* (Nov. 1966) 46 Nat. Elementary Principal at page 38. The author describes the result of an experiment separating 31 fourth-grade boys from girls: "The teachers and I feel that the following are some of the reasonably obvious advantages of single-sex classes: [¶] 1. There are fewer serious discipline problems. The behavior of the boys in separate classes seems more normal and is more acceptable to teachers. [¶] 2. The students are much happier and display a greater interest in all subject-matter and skill areas. [¶] 3. There is better attendance, which we feel is a direct result of the fact that the pupils like school more. [¶] 4. Children who have been withdrawn become more outgoing, more confident. (This is true of both boys and girls.) [¶]

Club's management to believe that there is a rational basis for giving boys a few hours a day when they do not have to carry their machismo on their sleeves? Whether or not we share these views is immaterial. What matters is that we have no right to force contrary theories on those who have devoted considerable time, energy, devotion and financial resources to the problem.

If I may suggest, the basic mistake of the majority opinion is that it views the Club's policies as being pointed toward the exclusion of girls. With that chip on the majority's shoulder, pejoratives come easily. If the court looked at the Club's activities more benignly as providing a service for boys—a service tailored to their needs—it would not find it necessary to reach such a wondrous result.

I therefore dissent.

On December 10, 1985, the opinion was modified to read as printed above. Appellant's petition for a rehearing was denied December 19, 1985. Mosk, J., Lucas, J., and Kaus, J.,* were of the opinion that the petition should be granted.

---

5. Students are more willing to ask questions if they do not understand something and feel freer to discuss ideas which otherwise might be embarrassing to them. In health, for example, both boys and girls are more at ease in studying the body, and the boys have made charts, drawings, and reports without urging. [¶] 6. Boys are more thoughtful and considerate of each other. They seem to want to help each other when someone is having difficulty. [¶] 7. Competition between the sexes is eliminated, and there is an excellent opportunity to establish the idea of working against one's own record rather than competing with others. [¶] 8. There is evidence of more cooperation within an all-boy or an all-girl class. A tremendous *esprit de corps* develops within the classes. [¶] 9. The lack of distractions from the opposite sex results in better work habits. [¶] 10. Motivation can be developed much more easily because it is not necessary to gear class work to the interests of both sexes. Instructional materials can be selected in terms of the particular characteristics and interests of the sex being taught. (This is especially true in reading and science.) [¶] 11. Boys take part more freely in art and music and do better work in foreign language when they are in separate classes. [¶] 12. There is greater participation in class activities. Both boys and girls overcome their fear of standing in front of a class to give reports and oral readings. There have been cases of striking improvement in this area. [¶] 13. Boys accept all phases of language arts instruction without complaint when there are no girls present. Boys who are below level in reading work harder in order to be nearer the level of their classmates. [¶] 14. It is much easier to do a good job in physical education—and this is significant in view of the importance of the first twelve years in developing physical skills. [¶] 15. The retention rate dropped in our entire school enrolment from 10 per cent in 1961-62 to 3 percent in 1962-63."

See also Monagan, *The Failure of Coed Sports* (Mar. 1983) 17 Psychology Today 58: "[A]fter a decade of attempts to rewrite the lineups of childhood, the great coed sports experiment appears to be failing. Although scarcely anyone asks them, most girls—and especially boys—don't seem to want any part of it, for reasons that may be as deeply entrenched as anatomy and the torturous uncertainty of adolescence itself."

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.