**Michael T. GADSON, M.D., Plaintiff,**

v.

**Richard L. NEWMAN, Individually; Richard L. Newman Ltd, an Illinois corporation, d/b/a Newman Clinic; St. Mary's Hospital, an Illinois not-for-profit corporation, Defendants.**

**No. 92–3047.**

United States District Court, C.D. Illinois, Springfield Division.

Dec. 3, 1992.

Thomas W. Kelty, Pfeifer & Kelty, P.C., Alexandra de Saint Phalle, Thomas F. Londrigan, Londrigan Potter & Randle P.C., Springfield, IL, for Michael T. Gadson, M.D.

Mark A. Drummond, Schmiedeskamp Robertson Neu & Mitchell, Quincy, IL, John T. Cusack, Gardner Carton & Douglas, Chicago, IL, for Richard L. Newman, Richard L. Newman, Ltd. and Newman Clinic.

Joseph A. Duesterhaus, James L. Palmer, Scholz Staff & Palmer, Quincy, IL, Mark L. Silbersack, Joseph E. Conley, Dinsmore & Shohl, Cincinnati, OH, for St. Mary's Hosp.

## OPINION

RICHARD MILLS, District Judge:

Presented here is a novel twist to the issue of whether physicians, lawyers and other professionals may be liable under the Illinois Consumer Fraud Act.

True, one does not ordinarily think of medical doctors in the business of selling products that defraud consumers.

However, the Illinois Consumer Fraud Act was amended to prohibit not only unfair competition, but any deceptive act or practice in the conduct of trade or commerce.

Thus, the issue before the Court: whether the practice of medicine qualifies as trade or commerce for the purposes of the Illinois Consumer Fraud Act. And specifically: whether an alleged agreement between a psychiatric clinic and a hospital to monopolize psychiatric services defrauds medical consumers.

## I.  *Facts*

There are three players involved in this dispute. Defendant St. Mary's Hospital (SMH) is a non-profit hospital in Quincy, Illinois. Plaintiff Dr. Michael T. Gadson is a psychiatrist. Defendant Dr. Richard L. Newman is a psychiatrist and practices medicine through the corporation "Newman Clinic Ltd."

Dr. Gadson alleges that on January 1, 1989, he entered into a contract with SMH to serve as the director of the SMH psychiatric "family" unit. Later, after becoming aware of the Gadson–SMH contract, Dr. Newman and his clinic signed a separate contract with SMH to manage all of SMH's psychiatric units during the term of Dr. Gadson's contract. The arrangement provided that SMH and Dr. Newman's clinic would jointly establish "programs" for all inpatient psychiatric treatment at SMH. One program, supervised by Dr. Gadson, would be for adult psychiatry. Another program director would be appointed for a "behavioral medicine" program. Dr. Newman's clinic would develop specific treatments for patients in the program. Psychiatrists participating in the program would be approved by both Dr. Newman's clinic and SMH.

Under the arrangement, SMH physicians could refer patients to the program. Psychiatrists from Dr. Newman's clinic could also refer patients requiring hospital treatment to the program. SMH agreed to pay Dr. Newman's clinic $90.00 per day per patient admitted to the program.

Dr. Gadson charges that the arrangement between Dr. Newman and SMH violates the Illinois Consumer Protection Act. *First,* Dr. Gadson alleges that the arrangement operates as an "undisclosed joint venture and profit center for SMH and Dr. Newman and his Clinic to the exclusion of Dr. Gadson and other potential competing entities, and to the detriment of health care consumers in the area of Quincy, Illinois, served by SMH."

*Second,* that under the arrangement, financially responsible patients upon emergency admission to SMH are self-referred by Dr. Newman to himself and other psychiatrists employed at his clinic.

*Third,* that the arrangement provides "undisclosed financial incentives" to Dr. Newman and psychiatrists of his clinic to admit patients to SMH in order to increase the patient census and revenue of SMH.

*Fourth,* that the arrangement provides "undisclosed financial incentives" to Dr. Newman and psychiatrists of his clinic for prescribing additional ancillary medical procedures to be performed at SMH thereby increasing SMH revenue, increasing health care costs, and decreasing competition in the Quincy area.

*Fifth,* that the arrangement provides for undisclosed substitution of employees of SMH with employees of Dr. Newman and his clinic with intent "to generate illegal, unethical, and conflict of interest self-referral of patients covered by Medicare," Medicaid, public aid assistance, insurance, and financially responsible patients.

Plaintiff Dr. Gadson seeks relief under the Consumer Fraud Act (Count IV), for conspiracy to commit consumer fraud (Count V), and for declaratory judgment and injunction (Count VII).

Defendants SMH and Dr. Newman move to dismiss Counts IV, V, and VII. In the alternative, they move for a more definite statement of Count VII per Fed.R.Civ.P. 12(e).

Additionally, in counts not considered in this motion to dismiss, Plaintiff alleges:

tortious interference with contract (Count I); tortious interference with a prospective business relationship or expectancy (Count II); breach of contract (Count III); and conspiracy to monopolize (Count VI).

## II. *Legal Standard on Motion to Dismiss*

■■■ In ruling on a motion to dismiss, the Court "must accept well pleaded allegations of the complaint as true. In addition, the Court must view these allegations in the light most favorable to the plaintiff." *Gomez v. Illinois State Board of Education,* 811 F.2d 1030, 1039 (7th Cir.1987). Although a complaint is not required to contain a detailed outline of the claim's basis, it nevertheless "must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). Dismissal is not granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

## III. *Analysis*

### (A). "Trade or Commerce"

■■ Defendants SMH and Dr. Newman first argue that the Illinois Consumer Fraud Act does not apply because the medical profession does not engage in "trade or commerce." The fact that a wrongdoer must engage in "trade or commerce" to be liable under the Act is well established. For instance, the stated purpose of the Illinois Consumer Fraud Act, as set forth in its preamble, is "[t]o protect consumers and borrowers and businessmen against fraud or deceptive acts or practices in the conduct of any *trade or commerce ....*" Ill.Rev.Stat. ch. 121½, ¶ 261 (1991) (emphasis ours). The following practices are prohibited by the act:

§ 2. Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, ... in the conduct of any *trade or commerce* are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

*Id.* ¶ 262 (emphasis ours). The statutory definitions of "trade" and "commerce" are given as the "advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State." *Id.* ¶ 261(f).

### (1) *Illinois caselaw*

The Court notes that Illinois courts have not squarely faced the issue of whether a business arrangement between a hospital and psychiatric clinic constitute "trade" or "commerce" under the Act. In *Frahm v. Urkovich,* 113 Ill.App.3d 580, 69 Ill.Dec. 572, 447 N.E.2d 1007 (1983) (*superseded by statute as stated in Rubin v. Marshall Field & Co.,* 232 Ill.App.3d 522, 173 Ill.Dec. 714, 597 N.E.2d 688 (1992)), for example, the clients of an attorney who represented them in a real estate transaction sued the attorney under the Consumer Fraud Act for misrepresenting certain material facts. The court upheld dismissal of the claim against the attorney because the practice of law was not an activity in "trade" or "commerce" that the Consumer Fraud Act was designed to regulate.

Relying on *Frahm, Feldstein v. Guinan,* 148 Ill.App.3d 610, 101 Ill.Dec. 947, 499 N.E.2d 535 (1986), held that the practice of medicine is not the equivalent of an ordinary commercial enterprise. *Feldstein* involved an employment contract dispute between a physician and Cook County Hospital. The physician entered into a one-year residency contract with the hospital in

1975. In 1976, the hospital informed the physician that it was filling his residency position with another person for their 1976 residency program. The hospital offered the physician another residency position in their 1977 residency program. Considering a suit brought by the physician against the hospital under the Illinois Consumer Fraud Act, the court affirmed the judgment of dismissal from the lower court because "[T]he statutory language making the Act applicable to trade or commerce does not include the practice of medicine as presented under the facts of this case." *Id.* at 613, 101 Ill.Dec. 947, 499 N.E.2d at 538.

In *Lyne v. Arthur Andersen & Co.*, 772 F.Supp. 1064, 1068 (N.D.Ill.1991), the court, again quoting *Frahm*, held that accountants are liable under the Illinois Consumer Fraud Act for services rendered in connection with securities offerings. *Lyne* noted that the medical and legal professions are afforded immunity from the Consumer Fraud Act because they are regulated by governmental bodies. Because accountants are not subject to similar regulations, the court held that accountants were not exempt from the Consumer Fraud Act.

However, these three cases may be distinguished from the case at bar for two reasons. First, *Frahm* and *Feldstein* interpreted the Illinois Consumer Fraud Act prior to amendments to the Act which were enacted on January 1, 1990. Before the amendments, the Illinois Consumer Fraud Act required proof of a "public injury" to state a cause of action. After the amendments, the Act provides that "Proof of a public injury, a pattern, or an effect on consumers generally shall not be required." Ill.Rev.Stat. ch. 121½, ¶ 270a(a) (1991). *See also Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 637 (7th Cir. 1992).

*Feldstein* and *Frahm* thus have dubious application to the current Illinois Consumer Fraud Act. The legal analysis in each of these cases is connected to the notion that a defendant only violates the Act if his or her actions affect the public at large. *Feldstein*, for example, was a suit over a single employment contract between the physician and a hospital. The court, in reaching its conclusion, stated: "[a]lthough the practice of medicine may have a business aspect, the commercial phases of medicine which *directly affect the public* are not at issue here." *Feldstein*, 148 Ill. App.3d at 613–15, 101 Ill.Dec. at 950–51, 499 N.E.2d at 538–39 (emphasis ours). Therefore, *Feldstein*, by its own language, leaves open the possibility that the Illinois Consumer Fraud Act would entertain a suit in the context of the commercial phases of medicine which affect the public at large.

By contrast, our Plaintiff Dr. Gadson alleges a direct effect on the public medical consumer. Paragraphs 25c, 25d, and 25i of Count IV of Dr. Gadson's complaint allege a scheme whereby St. Mary's provides undisclosed financial incentives to Newman to admit patients for treatment at St. Mary's. Assuming these allegations are true, this self-referral scheme would increase the cost of health care to consumers in the Quincy, Illinois area. *See* Council on Ethical and Judicial Affairs, *Conflicts of Interest—Physician Ownership of Medical Facilities*, 267 JAMA 2366, 2367 (1992); David Hemmenmway et al., *Physicians' Responses to Financial Incentives*, 322 New England J. Med. 1059, 1062 (1990). Thus, even to the extent a "public effect" is required under the Illinois Consumer Fraud Act, Dr. Gadson has stated a case with the potential to have far reaching effects on the general medical consumer.

Second, and more importantly, these three cases were only tangentially related to the business aspects of the legal and medical professions. The distinction between the business aspects medicine and the "actual practice of medicine" or the non-business aspects of medicine is crucial. For, as will be developed later, business aspects of medicine is not exempt from the Illinois Consumer Fraud Act.

The distinction between the business and non-business aspects of medicine arose in the context of federal anti-trust law. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 788, 95 S.Ct. 2004, 2013–14, 44 L.Ed.2d 572 (1975). *Goldfarb* considered the question of whether a minimum fee schedule for title examinations published by a coun-

ty bar association fell within the scope of the Sherman Anti–Trust Act. *Id.* The Sherman Anti–Trust Act was designed to bring within it "every person engaged in business whose activities might restrain or monopolize commercial intercourse among the states." *Id.* at 787–88, 95 S.Ct. at 2014. The Court noted that the setting of a minimum fee schedule was a "business aspect" of the legal profession. *Id.* at 788, 95 S.Ct. at 2014. This aspect had nothing to do with the actual non-business aspects of the profession, or the actual practice of law. Therefore, the Court refused to exclude the "learned professions" from the reach of the federal anti-trust laws even though they were not considered "ordinary business enterprises." *Id.*

The analysis in *Frahm* depended heavily on *Goldfarb*. *Frahm*, 113 Ill.App.3d at 583–84, 69 Ill.Dec. at 575, 447 N.E.2d at 1010. However, where *Goldfarb* held that the business aspects of the legal profession were subject to federal anti-trust regulation, *Frahm* held that the non-business aspects of the legal profession were not subject to the Illinois Consumer Fraud Act. The "business aspects" of the legal profession were not implicated because the misfeasance in *Frahm* occurred during the defendant attorney's "actual practice of law." Indeed, in reaching its conclusion the Court noted: "We conclude that the legislature's use of 'trade or commerce' in defining the application of the Act was not meant to include *the actual practice of law.*" *Id.* 113 Ill.App.3d at 584, 69 Ill.Dec. at 576, 447 N.E.2d at 1011 (emphasis ours).

Thus, under *Frahm*, if a lawyer's activities amount to the "practice of law," they are exempt from the coverage of the Illinois Consumer Fraud Act. Unfortunately, the court never defined the phrase "actual practice of law." Given that the *Frahm* court quoted *Goldfarb*, this Court assumes that the determination of a minimum fee schedule for attorneys is not the "practice of law," but instead is a "business aspect" of law, subject to regulation. We further interpret *Frahm* to mean that the "practice of law" exception includes activities directly related to the lawyer's professional training or where the lawyer is already subject to regulation from his or her professional organizations.

This definition of the "practice of law" is implicit in *Frahm* and explicitly spelled out in *Lyne*. The central issue in *Frahm* was whether the attorney misrepresented a material fact in the course of his representation with the client, that is, the issue of "attorney malpractice." The court stated: "In essence, plaintiffs seek a broad interpretation of the Act (Illinois Consumer Fraud Act) which would impose statutory liability for misconduct amounting to *professional malpractice.*" *Id.* 69 Ill.Dec. at 574, 447 N.E.2d at 1009 (emphasis ours). "Professional malpractice," of course, is an area fundamentally related to an attorney's or physician's professional training and regulation. *Frahm* was hesitant to extend the Illinois Consumer Fraud Act in this area. The motivation behind the court's hesitancy became apparent in *Lyne*:

> The medical and legal professions are afforded immunity from the Consumer Fraud Act primarily, because, unlike other commercial services, medical and legal bodies are regulated by governmental bodies. *See Guess* [*v. Brophy*, 164 Ill. App.3d 75], 115 Ill.Dec. [282] at 285, 517 N.E.2d [693] at 696 [ (1987) ] ("the legal profession is subject to a policing more stringent than that to which purveyors of most commercial services are subject").

*Lyne*, 772 F.Supp. at 1068. Thus, the professions are exempt from the Illinois Consumer Fraud Act because they are subject to other regulations. Where in *Frahm* the attorney was sued for malpractice, the subject of malpractice was already governed by a separate and developed body of law on malpractice and other professional regulations that obviated a need for the Illinois Consumer Fraud Act to impose additional regulations. However, this is not the case in the dispute currently before the Court. There has been no evidence presented to the Court that contracts between psychiatric clinics and hospitals are already subject to extensive professional regulation. The Court is also not asked, for example, to decide an issue of medical malpractice, or to apply the Illinois Consumer Fraud Act to

regulate how a doctor performs a surgery. Rather, the Court confronts the commercial effect of a business contract between a hospital and a medical clinic. It is alleged that this contract has a deleterious impact on an entire community of healthcare consumers. For these reasons, assuming the truth of Plaintiff's allegations, the Court finds no reason why contracts for medical service should be distinguished from ordinary commercial contracts which are regulated by the Illinois Consumer Fraud Act.

*Feldstein* also lacked a "business" or "commercial" effect, but for a markedly different reason than *Frahm*. To be sure, *Feldstein* dealt with a "business" contract between a hospital and a physician. However, as noted by the court, this arrangement was completely insulated from the public at large: "The *commercial phases of medicine* which directly affect the public are not at issue here." *Feldstein*, 148 Ill.App.3d at 613–15, 101 Ill.Dec. at 948–50, 499 N.E.2d at 536–38 (emphasis ours). Thus, the arrangement was not "trade" or "commerce" because it did not affect any commerce beyond the hospital's four walls. Therefore, as noted above, *Feldstein* does not have an application in the instant case where Plaintiff alleges that the business arrangement between SMH and Newman's Clinic has a direct public impact.

## (2) *FTC Guidelines*

Illinois legislative history also provides little guidance on interpreting the intent of the Illinois Consumer Fraud Act.[1] Therefore, the Court, as directed by Illinois law, must consult decisions of the Federal Courts and of the Federal Trade Commission under the Federal Trade Commission (FTC) Act to determine the intent of the Act. *See* Ill.Rev.Stat. ch. 121½, ¶ 261 (1991); *People v. All American Aluminum and Construction Co., Inc.*, 171 Ill. App.3d 27, 121 Ill.Dec. 19, 524 N.E.2d 1067 (1988).

The FTC guidelines provide: "Unfair methods of competition in or affecting commerce, are declared unlawful." 15 U.S.C. § 45(a)(1) (1988). Unlike Illinois caselaw (*Frahm* and *Feldstein*) which recognize an exception to the Illinois Consumer Fraud Act for the practice of law or medicine, the FTC regulates both professions.[2] Indeed, Congress has repeatedly rejected proposals to strip the FTC of the power to regulate professions. In 1982, Congress voted down an amendment which would have provided: "(c) Section 5(a)(2) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(2)) is amended by inserting immediately after 'except' the first time it appears the following: 'practitioner of a profession whose members are licensed and regulated by a State as a condition of independent practice

---

1. The Court ordered both parties to submit responsive briefs on the subject of the legislative history of the Illinois Consumer Fraud Act. No clear evidence supports the claim that contractual arrangements between professionals were intended to be included or excluded from the Act. Nevertheless, the Court does note that the scope of the Act was dramatically increased in recent years. Originally, the Act was limited to deception or fraud in the "sale or advertisement" of any "merchandise." Ill.Rev.Stat. ch. 121½, ¶ 262 (1971) (amended 1973). The 1973 Amendments greatly expanded the scope of the original act to prevent "unfair competition" or "unfair or deceptive acts or practices ... in the conduct of any trade or commerce." Ill.Rev. Stat. ch. 121½, ¶ 262 (1991). Proponents of the new amendments commented that the new Act was "very broad ... it encompasses just about every conceivable transaction ..." Tr. Senate Debates, June 30, 1973, at 265–66. We also note that the Act was intended to be liberally construed. Ill.Rev.Stat. ch. 121½, ¶ 271a (1991).

2. Defendant argues that FTC regulations do not apply to SMH because it is a non-profit corporation that is immune from the Act. This analysis is based on the contention that the term "corporation" as defined in 15 U.S.C. § 44 (1988), does not include non-profit organizations which are organized for and actually engaged in business for only charitable purposes. However, even assuming that SMH is a non-profit organization (a blanket assertion made without proof by the Defendant, especially when not all non-profit corporations are exempt, *see F.T.C. v. National Comm'n on Egg Nutrition*, 517 F.2d 485 (7th Cir.1975)), the Court finds this argument is without merit. The FTC definition of "corporation" in 15 U.S.C. § 44 requires that the corporation be "organized to carry on business for its own profit or that of its members." By contrast, the Illinois Consumer Fraud Act reaches all "corporations" without the requirement that they be organized for profit. *See* Ill.Rev.Stat. ch. 121½, ¶ 261(c) (1991). Because the Illinois Consumer Fraud Act is clear on this point, there is no need to consult the FTC regulations.

within the State, incorporated or unincorporated associations of State-regulated professionals.'" *Heslin v. Connecticut Law Clinic of Trantolo and Trantolo*, 190 Conn. 510, 461 A.2d 938 (1983). The Senate voted down this amendment by a vote of 59 to 37. 128 Cong.Rec. S31,389 (daily ed. December 16, 1982). A more limited proposal to restrict FTC regulations of the professions was again voted down in 1984. Sen.Rep. No. 98–215, 98th Cong. 1st Sess. 10, 11 (1984).

The legislative history behind the failed amendments also supports the FTC regulation of the medical profession. Senator Warren Rudman spoke out against the proposed 1982 amendments arguing that the FTC had only proceeded against the business practices of the medical profession, including kickbacks from laboratories to referring physicians. *Id.* at S31,379–80. He suggested that to revoke FTC's authority to scrutinize professional practices would be "to abdicate a national responsibility and is nothing short of absurd." *Id.* at S31,380. Senators Gorton and Heinz noted that if the exception were passed it would "create a privileged class" and "unnecessarily increase the costs of health and other professional services to all Americans." *Id.* at S31,381, S31,385. Senator William Proxmire noted that the only supporter of the exception was the AMA. *Id.* at S31388. He cited the opposition of then President Reagan, the *Wall Street Journal*, and other professional organizations and concluded: "[T]he overwhelming public response is that this broad exemption is wrong: It is bad economics, bad politics and, most importantly, it is simply unfair." *Id.* at S31,389.

The FTC has also unequivocally stated that state-regulated professions are not exempt from the coverage of the FTC Act. *In re Wilson Chemical Co.*, 64 F.T.C. 168, 186–87 (1964); Reauthorization of the Federal Trade Commission, 1982 Hearings on S.1984, Before the Senate Committee on Commerce, Science, and Transportation, 97th Cong., 2d Sess., 32–36 (letter, by direction of the Federal Trade Commission, of James C. Miller III, Chairman). In addition, because Congress has not acted to change the FTC's interpretation of the stat-

ute, this is also a significant indicator that Congress intended to acquiesce in the administrative interpretation of the statute. *See Bob Jones University v. United States*, 461 U.S. 574, 600–01, 103 S.Ct. 2017, 2033, 76 L.Ed.2d 157 (1983).

However, perhaps the most relevant indication that the professions are not immune from FTC coverage comes from federal courts. Federal courts have repeatedly indicated that FTC and other anti-trust regulations apply to the commercial aspects of the medical profession. *Summit Health Ltd v. Pinhas*, —— U.S. ——, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991) (Sherman Anti-trust § 1 violation); *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (Federal Trade Commission Act § 5 violation); *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982) (Sherman Anti-trust § 1 violation); *American Medical Ass'n v. F.T.C.*, 638 F.2d 443, 448 (2d Cir.1980), *aff'd*, 455 U.S. 676, 102 S.Ct. 1744, 71 L.Ed.2d 546 (1982) (citing *Goldfarb*, 421 U.S. at 778, 95 S.Ct. at 2008) (Federal Trade Commission Act § 5 violation).

Defendants Dr. Newman and SMH argue the above cases are not applicable because the challenged activities in *AMA* and *Indiana Federation of Dentists* do not relate to contracts for medical services. In *AMA*, for example, the AMA's authoritative interpretations of the AMA guidelines were found to violate § 5 of the Federal Trade Commission Act because they restricted competitive advertising and solicitation among physicians. *AMA*, 638 F.2d at 448. By contrast, Defendants argue, the dispute in the instant case concerns a contractual arrangement to provide medical care—not medical advertising. This distinction, however, is not supported by any evidence. Moreover, bestowing special status on contracts for medical care is a rehashing of the argument the Court rejected in refusing to apply *Feldstein*. Medical contracts, for medical service or medical advertising, have no intrinsic difference. Rather, *Frahm* dictates that only the actual practice of medicine (which includes those aspects of medical practice which re-

ceive comprehensive training or which is regulated by the professions themselves) is immunized from the jurisdiction of the Illinois Consumer Fraud Act.

### (B) Fraud or Deceptive Practices

■ As noted above, the Illinois Consumer Fraud Act prohibits "Unfair methods of competition and unfair or deceptive acts or practices...." Ill.Rev.Stat. ch. 121½, ¶ 261 (1991). Defendants argue that an allegation of an unfair trade practice is not enough to state a cause of action under the Illinois Consumer Fraud Act after the Illinois Supreme Court decision in *Laughlin v. Evanston Hospital*, 133 Ill.2d 374, 140 Ill. Dec. 861, 550 N.E.2d 986 (1990). Under *Laughlin,* a cause of action under the Act must involve some conduct that "defrauds" or "deceives" others. Because consumers are not in any way deceived by the business arrangement between SMH and Dr. Newman's clinic, Defendants argue that a cause of action does not exist.

However, the Court finds that Plaintiff Dr. Gadson has alleged deceptive practice. We note that many deceptive acts are specifically charged:

> ¶ 25. Newman and his Clinic engaged in unfair and deceptive methods of competition and in deceptive acts and practices by committing one or more of the following acts or course of conduct: (*See* allegation contained in a-i, which include undisclosed financial incentives, conflict of interest, self-referrals, increased billings through hospitalizations and ancillary procedures where the conflict of interest is undisclosed, compounded by an intent to eliminate competition.)

Plaintiff's Complaint Count IV, ¶ 25 (a-i). The fact that these undisclosed referrals and other financial incentives state a case under the Illinois Consumer Fraud Act was established in *Sullivan's Wholesale Drug Co. v. Faryl's Pharmacy, Inc.,* 214 Ill. App.3d 1073, 158 Ill.Dec. 185, 573 N.E.2d 1370 (1991). *Sullivan's* found that a kickback scheme where a nursing home pocketed 15% of the drug profits obtained from the sale of drugs to its patients violated the Illinois Consumer Fraud Act.

Defendants argue that *Sullivan's* does not apply because the $90 fee rebated to the Newman Clinic for hospital in-patient treatment is not a kickback but is a reimbursement for services. Newman's physicians actually perform much of the medical treatment to the patients they refer to SMH. Therefore, Defendants' claim that the $90 fee arrangement is not misleading to the patients, but instead is a fee-for-service compensation for services that Newman's doctors provide.

Although the Court acknowledges this distinction, it is not supported by the holding in *Sullivan's. Sullivan's* overruled a summary judgment decision in favor of the defendant nursing home. The court held that the issue of whether the nursing home's practice of keeping 15% of the profits was patently deceptive was a question of fact to be resolved by the trier of fact. The actual "deception" in *Sullivan's* had nothing to do with whether the compensation was a fee-for-service arrangement. Rather, the arrangement was deceptive because the nursing home patients were not aware of the 15% kickback arrangement. *Id.* at 1075–77, 158 Ill.Dec. at 188–90, 573 N.E.2d at 1373–75. This "deception" existed even though a copy of the agreement between the drug company and the nursing home was on file in the nursing home office and was available for public inspection. The court found that the nursing home was obliged to "affirmatively disclose these charges [the 15% kickback arrangement]." *Id.*

The same type of "deception" exists in the case before the Court. Defendants SMH and Dr. Newman have provided no evidence that SMH or Dr. Newman's clinic supplied information about the $90.00 fee arrangement to the psychiatric patients who were enrolled in the "programs". Therefore, the rule of *Sullivan's* is dispositive in the instant case.

In addition, other forms of "deception" may exist if the Court assumes the truth of allegations that the undisclosed agreement between SMH and Dr. Newman's clinic increases health care costs to consumers. This deception may be visualized as it applies to insurance payments. If the parents of a troubled teenager have insurance

limits that are exhausted through psychiatric in-patient services in the hospital, and the parents are unaware of the doctor's financial incentive to admit their child to the hospital, they will be more prone to agree with his or her recommendation and hospitalize the child.

Similarly, the type of contractual arrangement between SMH and Dr. Newman's clinic increases the propensity for affirmative misstatements ("deception") made by the doctor. Medical studies confirmed the danger of this abuse:

> Our results add to the existing literature suggesting that physicians given appropriate motivation (fee for service reimbursement) and appropriate circumstances (less than full capacity of patients) can manipulate demand for care and consequently patient use of services. (footnotes omitted). This study substantiates, with direct evidence, the observation made by Wilenski and Rossiter (footnote omitted) that physicians induce or initiate demand for care.

Hickson, Altemeir and Perrin, *Physician Reimbursement by Salary or Fee for Service: Effect on Physician Practice Behavior in a Randomized Prospective Study*, 3 Pediatrics 349–50 (Sept.1987). Thus, given the wide range of deception that is alleged, the Court allows Plaintiff Dr. Gadson the opportunity to prove his case.

**(C) Standing**

■ Defendants SMH and Dr. Newman next argue Plaintiff Dr. Gadson lacks standing to enforce violations of the Illinois Consumer Fraud Act. They claim that Dr. Gadson is not a person or a business who suffered "damage as a result of a violation of this [the Illinois Consumer Fraud] Act." Ill.Rev.Stat. ch. 121½, ¶ 270a(a) (1991). The Court does not agree.

■ The proper test for standing was enunciated in *Downers Grove Volkswagen v. Wigglesworth Imports, Inc.*, 190 Ill. App.3d 524, 137 Ill.Dec. 409, 546 N.E.2d 33, 41 (1989). *Wigglesworth* found that where the dispute involves two businesses who are not consumers, the test for standing is whether "the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." The court found that plaintiff, who was a business competitor of the defendant, stated a case against defendant by alleging that the defendant published false information about its prices to consumers. *Id.* There was no requirement that plaintiff plead any special damages other than damages to "reputation", "business" or "prestige." *Id. Wigglesworth* also noted that the requirements for standing under the act were to be liberally construed. *Id.*

The Court finds that Plaintiff Dr. Gadson's pleadings meet this test. In paragraph 25 of Count IV of his complaint, Dr. Gadson alleges harm to the medical consumers in the Quincy area because of SMH and Dr. Newman's fraudulent and deceptive practices. Dr. Gadson also notes that his own business has been damaged as a result of these actions. These pleadings satisfy the "liberal construction" of the pleading requirements as stated in *Wigglesworth. Id.*

**(D) Declaratory Judgment and Injunction**

■ Defendants SMH and Dr. Newman next argue that Count VII of Plaintiff's complaint, seeking a declaratory judgment per 28 U.S.C. § 2201 (1988), should be dismissed or stricken because there is no actual controversy. The Court agrees that the pleading is ambiguous and also notes that Plaintiff has not responded to Defendants' arguments.

Count VII is ambiguous for several reasons. First, Plaintiff alleges in paragraph 24 of Count VII that the action for declaratory judgment and injunction is brought pursuant to federal statute 28 U.S.C. §§ 2201, 2202 (1988). However, on page 14 of Plaintiff's "Brief Opposing Defendant's Motions to Dismiss and/or to Strike," Plaintiff characterizes Count VII as based on state law (the Illinois Consumer Fraud Act).

Second, and more importantly, Plaintiff Dr. Gadson is not a signatory of the contract between SMH and Dr. Newman's clinic. It is thus unclear how Dr. Gadson has standing to contest the contract in ques-

tion. True, under the Illinois Consumer Fraud Act competing business entities have standing in some circumstances, but this count is apparently not based on state law.

Third, there has been no controversy alleged which can be addressed by a declaratory judgment.

## IV. *Conclusion*

The Illinois Consumer Fraud Act was promulgated to prevent consumer fraud at all levels. Since the adoption of the Act, only two entities have been specifically exempted the Act: agents of the media (Ill. Rev.Stat. ch. 121½, ¶ 270b(3) (1991)); and real estate agents and brokers (*Id.* ¶ 270b(4)). No legislative provision was ever offered to immunize the medical profession from inclusion in the Act.

Nor does this Court think the medical profession should be given special treatment in the "business aspect" of the medical profession. Physicians and hospitals sell medical services and goods to a wide range of consumers. For the courts to create an exception would, in the words of Senators Gorton and Heinz "create a privileged class" and "unnecessarily increase the costs of health and other professional services to all Americans." 128 Cong.Rec. S31,388.

However, the Court notes that there are significant differences between the medical profession and other service industries. The medical profession, unlike other service industries, is governed by a host of regulations and professional training requirements which set professional standards in every area from admission to the profession to proper surgery techniques. For these "non-business" aspects, the medical profession has expertise to set the proper professional standards.

But the instant case falls outside the expertise of the professional regulations of the medical community. It involves a dispute in a contract entered into between a hospital and a psychiatric clinic. This contract allegedly deceives an entire community of medical consumers. We therefore will allow Plaintiff the opportunity to prove his case under the Illinois Consumer Fraud Act.

*Ergo,* Defendants' motion for a more definite statement is ALLOWED as to Count VII of Plaintiff's complaint. Plaintiff has ten days from the date of entry of this opinion to respond or the Court will strike Count VII.

Defendants' motion to dismiss is DENIED as to Counts IV and V of Plaintiff's complaint.