SIXTH DIVISION

May 7, 1999

No. 1-96-3444

KARIM BAKSH, )

) Petition for review

Petitioner-Appellant, ) of order of HRC

)

v. ) 

)

THE HUMAN RIGHTS COMMISSION, )

COMMISSIONER ROSE M. JENNINGS, )

COMMISSIONER MATHILDA A. JAKUBOWSKI, )

COMMISSIONER GRACE KAMINKOWITZ, )

COMMISSIONER RANDALL C. RAYNOLDS, )

COMMISSIONER SYLVIA NEIL, )

COMMISSIONER VIVIAN STEWART TYLER, )

COMMISSIONER RUDOLPH S. SHOULTZ, )

COMMISSIONER JANE YAYES RADER, ) 

COMMISSIONER CLYDE H. BROOKS, ) 

COMMISSIONER ISIAH THOMAS, and THE )

ESTATE OF G.S., BY ITS EXECUTOR, )

S.A.B., )

)

Respondents-Appellees. )

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

This is a direct administrative review action in which a dentist seeks review of an order and decision of the Illinois Human Rights Commission (the Commission).  The Commission found that the dentist violated the Illinois Human Rights Act (the Human Rights Act)(775 ILCS 5/1-101 
et seq.
 (West 1996) when he referred an HIV-

positive patient (G.S.) to another facility for routine dental care.  The Commission awarded the following:  $48 in actual damages; $8,000 for emotional distress; $339,609 in attorney fees; and $8,146.32 for costs.  The dentist (petitioner) petitioned this court for direct review and raises the following issues:  (1) whether the Commission properly allowed G.S.'s estate to substitute for G.S. as complainant in the action following G.S.'s death; (2) whether a dental office is a place of public accommodation under the Human Rights Act; (3) whether petitioner discriminated against G.S. when he referred G.S. to another facility for routine dental care; (4) whether the charge was timely filed; (5) whether the awards for actual damages and emotional distress were proper; (6) whether petitioner was denied due process; and (7) whether the award of attorney fees was proper.  We reach only issues (1), (2) and (4) and we reverse.

In September 1986, petitioner Karim Baksh, D.D.S., was in private practice of limited-general dentistry and provided regular examinations and teeth cleaning as well as doing crowns, caps, bridges, root canal work, and simple extractions.  G.S. had been a regular patient of petitioner for over 10 years prior to September 1986.  Since at least September 1986, G.S. had been infected with the human immunodeficiency virus (HIV), the causative agent of the acquired immune deficiency syndrome (AIDS).

G.S. filed a charge with the Department of Human Rights on March 20, 1987, and a complaint with the Commission on February 11, 1988, alleging that in September 1986 petitioner refused to treat him after being informed by him that he had tested positive for HIV and that petitioner's actions in so refusing constituted illegal discrimination on the basis of handicap by a place of public accommodation under the Human Rights Act.  On May 23, 1988, G.S. was granted leave to file an amended complaint.  An evidentiary hearing was held before administrative law judge (ALJ) Patricia A. Patton, which began on October 30, 1989, and ended on November 2, 1989.

The following testimony, relevant for purposes of this opinion, was adduced at the hearing.  G.S. testified that he telephoned petitioner on September 5, 1986, a few days before a scheduled appointment for routine dental cleaning and examination.  G.S. told petitioner that he had a sore throat, which was probably due to a herpetic lesion on the uvula of his mouth and that he wanted to reschedule his September 9 appointment.  During this call, G.S. also told petitioner that he was HIV positive but that there should be no difficulty providing him with care since Darla, one of petitioner's hygienist, always wore gloves and a face mask.  According to G.S., petitioner responded by saying that G.S. should reschedule his appointment when he felt better.

G.S. further testified that he next spoke with petitioner on September 22, 1986.  G.S. telephoned petitioner in response to a message left by petitioner at G.S.'s place of business for S.B., G.S.'s live-in companion and business partner.  During the call, petitioner asked him if S.B. was "safe to treat."  G.S. responded that petitioner would have to ask S.B. that question.  G.S. stated that petitioner then told him that he could not treat him in his office anymore and that G.S. would have to go elsewhere.  Petitioner told him there was a Peter "someone" at Northwestern University who could treat him.  G.S. asked for this doctor's telephone number but petitioner did not have it.  G.S. later spoke with his doctor, Doctor Norman, who told G.S. he could see Dr. Peter Hurst at Northwestern.  Subsequently, G.S. sent a letter to petitioner requesting that petitioner forward his dental records to Dr. Hurst.  G.S. made an appointment at Northwestern and, on September 29, 1986, had his teeth cleaned and examined by Dr. John Davis.

Petitioner also testified at the hearing.  Petitioner stated that during the first week of September 1986 he spoke with G.S. on the telephone.  During this call, G.S. told petitioner that he would like to postpone his appointment because he had a herpetic lesion in his mouth.  G.S. also told him that he had tested positive for HIV.  Petitioner transferred the call to the receptionist so that G.S. could make another appointment.  After the call, petitioner spoke with Lynette Lueker, the dental hygienist scheduled to clean G.S.'s teeth, and told her that G.S. was HIV positive.  Petitioner asked the hygienist how she felt about cleaning G.S.'s teeth.  The hygienist responded that she did not know much about treating people with HIV and that she was reluctant to do so.

Petitioner further testified that he subsequently telephoned his friend, Dr. Akal, who was chairman of the Illinois State Dental Society Peer Review Committee, and asked his advice.  Dr. Akal told petitioner he would call him back and did so later that same day.  During the later telephone conversation, Dr. Akal told petitioner that there was a clinic at Northwestern University Dental School specially set up to treat patients with HIV and that Peter Hurst was the doctor in charge.  According to petitioner, Dr. Akal suggested that petitioner refer G.S. to the clinic as it was only one block away from petitioner's office.

Petitioner testified that he next spoke with G.S. on or before September 9, 1986, and told G.S. that the hygienist was reluctant to clean his teeth.  He further told G.S. that he would like to refer him to a clinic at Northwestern University, which was specially set up to treat patients who had tested positive for HIV.  Petitioner told G.S. that, Dr. Peter Hurst was in charge of the clinic and he gave G.S. the telephone number and directions.  G.S. responded that he did not see any problem with being treated at petitioner's office since Darla, the hygienist who treats him, always wears gloves and a mask and that all they would have to do is wipe the instruments with Clorox.  Petitioner told G.S. that Darla would be out of town.  Petitioner also told G.S. that he did not know much about the virus and that he felt it would be safer for G.S. to receive treatment at the clinic as it is more knowledgeable than petitioner.  Petitioner later received a letter from G.S. requesting that his X rays be sent to Northwestern University.

Petitioner further testified that he next spoke with G.S. on September 22, 1986.  Petitioner's office had called S.B.'s place of business to confirm S.B.'s appointment for the next day.  G.S. asked to speak with petitioner, believing that petitioner was calling to cancel S.B.'s appointment.

A little more than two years after the hearing in February 1992, ALJ Patton died prior to issuing a decision.  On August 20, 1992, a supplemental hearing was held before Chief Judge Jane Bularzik and additional testimony was provided.  By agreement of the parties, the factual record from both hearings was submitted to Chief Judge Bularzik.  On July 8, 1994, Chief Judge Bularzik issued her recommended liability determination, recommending $48 in actual damages and $8000 in emotional damages.  On August 3, 1995, Chief Judge Bularzik issued her recommended order and decision on attorney fees and costs suggesting an award of $347,755.32 in fees and costs.  G.S. died on October 28, 1995.  The estate of G.S., by its executor, S.A.B. (respondent), was substituted as complainant by order of the Commission on February 6, 1996.  On June 27, 1996, the Commission issued its order and decision affirming Chief Judge Bularzik's determinations.  On September 6, 1996, the Commission denied petitioner's petition for rehearing and he now appeals.

I.  STANDARD OF REVIEW

It is well established that when reviewing a decision of an administrative agency "[t]he findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct."  735 ILCS 5/3-110 (West 1994).  We must sustain the Commission's findings of fact unless we determine that such findings are against the manifest weight of the evidence.  
Zaderaka v. Illinois Human Rights Comm'n
, 131 Ill. 2d 172, 180 (1989).  We are not bound, however, to give similar deference to the Commission's conclusions of law or statutory construction because this court exercises independent review over such questions.  
Raintree Health Care Center v. Illinois Human Rights Comm'n
, 173 Ill. 2d 469 (1996).  Because the construction of a statute is a question of law, the standard of review on this issue is 
de novo
.  
Lucas v. Lakin
, 175 Ill. 2d 166, 171 (1997).

II.  SURVIVABILITY OF CLAIM

G.S. died on October 28, 1995, before the Commission issued its Order and Decision on June 27, 1996.  Petitioner argues that as a result, G.S.'s cause of action has abated.

The Commission's procedural rules explicitly provide that, "[i]f a Party to a Complaint dies, the proper Party or Parties may be substituted upon motion."  56 Ill. Adm. Code, §5300.660(b) (1996).  The definition section explains that "[t]he term 'Party' shall refer to a Person designated as Complainant or Respondent in a Charge or Complaint."  56 Ill. Adm. Code, §5300.10 (1996).  In the instant case, the Commission noted that "[i]t is clear that the complainant's estate can be substituted for the complainant upon his death, [for such substitution] is provided for in the Commission's rules and has been a practice of this Commission."

Nevertheless, petitioner argues that the statutory cause of action for the alleged violation of the Human Rights 
Act does not survive the death of G.S. because no specific provision for such survival is provided in the Illinois Survival Act (the Survival Act)  (755 ILCS 5/27-6 (West 1992)).

While the Human Rights Act may not provide for the survival of G.S.'s cause of action upon his death, "[i]t is well-established that the Illinois survival statute allows a decedent's representa-

tive to maintain those common law or statutory actions which had already accrued to the decedent prior to his death.  [Citations.]"  
Wasleff v. Dever
, 194 Ill. App. 3d 147, 152 (1990).  The Survival Act provides in pertinent part:

"In addition to the actions which survive by the common law, the following also survive: *** actions to recover damages for an injury to real or personal property ***."  755 ILCS 5/27-6 (West 1992).

Illinois courts have repeatedly held that the term "personal property" as used in the Survival Act includes intangible property, such as rights of action under statutes or the common law that had accrued prior to the decedent's death.  See
 
McDaniel v. Bullard
, 34 Ill. 2d 487 (1966); 
Stonestreet v. Iroquois County Sheriff's Merit Comm'n
, 150 Ill. App. 3d 1092 (1986); 
Bryant v. Kroger Co.
, 212 Ill. App. 3d 335 (1991).

 In the instant case, petitioner argues that G.S.'s action did not accrue prior to his death because the Commission's order and decision was not entered until eight months after G.S.'s death.  Petitioner asserts that G.S. was not entitled to any damages as of the date of his death.  To counter this argument, respondents assert that, G.S.'s cause of action for compensatory damages accrued in September 1986 when petitioner unlawfully discriminated against G.S.  We agree with respondents.

Respondents rely, in part, on three cases in which causes of action survived.  First, in 
McDaniel v. Bullard
, 34 Ill. 2d 487 (1966), the Illinois Supreme Court considered the issue of whether a statutory cause of action under the Wrongful Death Act (Ill. Rev. Stat. 1963, ch. 70, par. 1) survived the death of the plaintiff, a child whose parents had been killed in a car accident, which occurred after the complaint had been filed.  The court held that, the action was personal property under the Survival Act and survived the death of the child.  
McDaniel
, 34 Ill. 2d at 491.  

Second, respondents rely on 
Stonestreet v. Iroquois County Sheriff's Merit Comm'n
, 150 Ill. App. 3d 1092 (1986), in which the third district cited 
McDaniel
 with approval and held that a suit by a police officer challenging his discharge by the sheriff and county commission accrued to the deputy sheriff prior to his death and constituted personal property under the Survival Act; thus, it survived his death.

Third, respondents rely on 
Bryant v. Kroger Co.
, 212 Ill. App. 3d 335 (1991), in which the court held that a husband's cause of action for loss of consortium resulting from injuries sustained by his wife survived the husband's death.  The court found that the husband's claim for loss of consortium is personal property within the meaning of the Survival Act 
and, therefore, did not abate at his death.  
Bryant
, 212 Ill. App. 3d 335. 

We note as well that the Illinois Supreme Court has repeatedly and explicitly disapproved of the rule of abatement.  
Murphy v. Martin Oil Co.
, 56 Ill. 2d 423 (1974); 
McDaniel v. Bullard
, 34 Ill. 2d 487 (1966); see also 
Bryant v. Kroger Co.
, 212 Ill. App. 3d 335 (1991)(discussing Illinois Supreme Court's disapproval of rule of abatement).

Based on the above, we find that G.S.'s cause of action for compensatory damages under the Human Rights Act accrued in September 1986 when the alleged discrimination occurred and that G.S.'s cause of action 
constitutes "personal property" under the Survival Act.  Thus, G.S.'s cause of action survives his death and the substitution of the estate was proper.

We also reject petitioner's assertion that the Act is penal, as opposed to remedial, in nature and therefore G.S.'s cause of action does not survive.  Both this court and the Illinois Supreme Court have described the Act as remedial.  
Board of Trustees of Community College District No. 508 v. Human Rights Comm'n
, 88 Ill. 2d 22 (1981); 
Tandy Corp. v. Human Rights Comm'n
, 264 Ill. App. 3d 828 (1994).

III.  TIMELY FILING OF CHARGE

In Illinois, a Human Rights Act violation charge must be filed within 180 days after it was allegedly committed.  775 ILCS 5/7A-

102(A)(1)(West 1992).  Respondents assert that G.S. was refused treatment on September 22, 1986, and G.S. filed his complaint on March 20, 1987, 179 days after September 22, 1986.  Petitioner asserts that he referred G.S. on or before September 9, 1986, and therefore, the complaint was filed more than 180 days after the alleged violation and is not timely.

G.S. testified that the telephone call occurred on September 22, 1986, and he explained why the telephone call had such a substantial impact on him and why he remembered it so clearly.  The record also contains letters written by G.S., which confirmed the September 22, 1986, date.

This court may not determine the credibility of the witnesses or resolve conflicting evidence.  
Zaderaka v. Illinois Human Rights Comm'n
, 131 Ill. 2d 172 (1989).  There is substantial evidence in the record supporting the Commission's finding that the alleged discriminatory act occurred on September 22, 1986; therefore, we find that the Commission's finding that the complaint was timely filed was proper.

IV.  PLACE OF PUBLIC ACCOMMODATION

Finally, the critical issue raised by the parties is whether a dental office is a "place of public accommodation" under the Human Rights Act.  This is an issue of first impression in the reviewing courts of Illinois.  

The Human Rights Act provides:

"It is a civil rights violation for any person on the basis of unlawful discrimination to:

(A) *** Deny or refuse to another the full and equal enjoyment of the facilities and services of any public place of accommodation."  775 ILCS 5/5-102(a)(West 1992).

The Act's definition of "place of public accommodation," in its entirety, is as follows:

"(1) Place of public accommodation means a business, accommodation, refreshment, enter-tainment, recreation, or transportation facil-ity of any kind, whether licensed or not, whose goods, services, facilities, privileges, advan-tages or accommodations are extended, offered, sold, or otherwise made available to the public.

(2) By way of example, but not of limita-tion, place of public accommodation includes facilities of the following types:  inns, res-taurants, eating houses, hotels, soda foun-tains, soft drink parlors, taverns, roadhouses, barber shops, department stores, clothing stores, hat stores, shoe stores, bathrooms, restrooms, theatres, skating rinks, public golf courses, public golf driving ranges, concerts, cafes, bicycle rinks, elevators, ice cream parlors or rooms, railroads, omnibuses, busses, stages, airplanes, street cars, boats, funeral hearses, crematories, cemeteries, and public conveyances on land, water, or air, public swimming pools and other places of public accommodation and amusement."  775 ILCS 5/5-101(A)(West 1992).

A dental office is not specifically enumerated as a "place of public accommodation" under the Human Rights Act; therefore, we must necessarily determine whether a dental office falls within the broad statutory definition of that term.  In so doing,

"we must focus on the language of the statute itself. [Citation.]  Legislative intent is the controlling inquiry in construing a statute, and the statutory language is the best indication of that intent. [Citation.] Statu-tory provisions must be read as a whole, and no word or paragraph should be interpreted so as to be rendered meaningless."  
Boaden v. Depart-ment of Law Enforcement
, 267 Ill. App. 3d 645, 651 (1994), 
aff'd.
 171 Ill. 2d 230 (1996).

Respondents argue that a dental office falls under the plain language and broad definition of "public accommodation" found in subsection (A)(1) of the Human Rights Act (775 ILCS 5/5-101(A) (West 1992)), which provides that a "place of public accommodation" includes a "business *** facility of any kind."  However, an interpretation of the phrase "business *** facility of any kind" as broad as respondents urge would render the Human Rights Act's definition of "place of public accommodation" and the accompanying examples found in subsection (A)(2) surplusage.  Had the legislature intended such an all-encompassing definition of a "place of public accommodation" the definition would simply read "a 'place of public accommodation' is a business facility of any kind."  See, e.g., 
Isbister v. Boys' Club of Santa Cruz, Inc.
, 40 Cal. 3d 72, 78-79, 707 P. 2d 212, 215-16, 219 Cal. Rptr. 150, 153-

54 (1985).  The words and structure of the statute indicate some limitation as to the type of "business" intended for inclusion and are not so broad as to automatically include every conceivable interpretation of a "business."  Thus, a dental office does not fall 
per se
 under the plain language of subsection (A)(1) of the Human Rights Act as a "business *** facility of any kind" and our analysis turns to further judicial interpretation of the statute.

The Illinois Supreme Court has addressed this section of the Human Rights Act in 
Board of Trustees of Southern Illinois University v. Department of Human Rights
, 159 Ill. 2d 206, 211 (1994) (
SIU
).  There, in determining whether an academic program in a public institution is a "place of public accommodation," the supreme court interpreted the phrase "other places of public accommodation and amusement" in subsection (A)(2) (775 ILCS 5/1- 101(A)(West 1992)) and directed that it be construed under the doc-

trine of 
ejusdem generis
.  The doctrine of 
ejusdem generis
 provides:

"when a statute lists several classes of persons or things but provides that the list is not exhaustive, the class of unarticulated per-son or things will be interpreted as those 'others such like' the named persons or things."  
SIU
, 159 Ill. 2d at 211.

Of significance, the supreme court did not focus upon the undisputedly public character of the academic endeavor, in a state-funded university, but focused upon the nature of the activity itself, education, and whether education was similar to the activities enumerated in the statute.  It concluded it was not.  In holding that an academic program in a public institution is not a "place of public accommodation," the admittedly divided court stated:

"The cited establishments are examples of facilities for overnight accommodations, enter-tainment, recreation or transportation.  *** 

Thus, what was anticipated by the General Assembly is a restaurant, or a pub, or a book-

store."  159 Ill. 2d at 212.

Still, respondents urge that the Human Rights Act is a remedial statute to be interpreted broadly to effectuate its purpose and favors inclusion of a dental office as a "business *** facility of any kind."  Respondents, by their argument, urge our focus solely on a dental office as a "business *** facility of any kind" and appear to abandon the other definitions of "accommodation, refreshment, entertainment, recreation, or transportation facility of any kind."  Thus, our analysis, pursuant to the directive of the supreme court, concerns the nature of dental services, whether they are similar to the activities enumerated in the Human Rights Act and whether a dental office is a "business."

The nature of medical and legal services and whether those services and their distribution constitute "trade" and "commerce" has already been considered by Illinois courts in addressing another remedial statute, the Consumer Fraud and Deception Business Prac-tices Act (Consumer Fraud Act) (815 ILCS 505/1 
et seq.
 (West 1994)).  The Consumer Fraud Act, its definitions and judicial interpretations are instructive.  

First, we note that the Consumer Fraud Act and the Human Rights Act are both remedial.  The purpose of the Consumer Fraud Act is "to protect consumers and borrowers and businessmen against fraud or deceptive acts or practices in the conduct of any trade or commerce."  
Lyne v. Arthur Anderson & Co
., 772 F. Supp. 1064 (1991). Second, we note that the Consumer Fraud Act and the Human Rights Act both have definitions of "trade" "commerce" or "business."  The statutory definitions of "trade" and "commerce" in the Consumer Fraud Act are the:

"advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include trade or commerce directly or indi-rectly affecting the people of this State."  815 ILCS 505/1(f) (West 1994).

The definitions in the Consumer Fraud Act are broad, perhaps broader than those in the Human Rights Act, and assuming respon-

dents, argument, dental services could be subject to the "sale *** of any services" under the Consumer Fraud Act.  However, Illinois courts have interpreted the definitions of the Consumer Fraud Act to exclude medical services and legal services.

In 
Feldstein v. Guinan
, 148 Ill. App. 3d 610 (1986), we held that the practice of medicine is not an ordinary commercial enterprise and the Consumer Fraud Act does not apply to the practice of medicine.  In so holding, we relied on 
Frahm v. Urkovich
, 113 Ill. App. 3d 580 (1983), in which we ruled that the actual practice of law was too distinct from commercial practices to be covered by the Consumer Fraud Act.

In 
Gadson v. Newman
, 807 F. Supp. 1412 (C.D. Ill. 1992), the United States District Court for the Northern District of Illinois noted that there are significant differences between the medical profes-sion and other service industries and that nonbusiness aspects of the medical profession are excluded from the Illinois Consumer Fraud Act.  
Gadson
, 807 F. Supp. at 1415.  The district court found that the contract at issue was a business contract between a physician and a hospital and, thus, distinct from the practice of medicine.

Similarly, in 
Doe v. Northwestern University
, 289 Ill. App. 3d 39 (1997), we affirmed the dismissal of a Consumer Fraud Act claim against a dental school and a dental student by relying on 
Frahm
 and 
Feldstein
 and held that "the provision of dental services for educational purposes does not constitute trade or commerce within the meaning of [the Consumer Fraud] Act."  
Doe
, 289 Ill. App. 3d at 45.  The supreme court affirmed the dismissal on other grounds without reaching the Consumer Fraud Act issue.  
Majca v. Beekil
, 183 Ill. 2d 407 (1998).

Finally and importantly, in 
Cripe v. Leiter
, 184 Ill. 2d 185 (1998), the supreme court held that the Consumer Fraud Act does not apply to legal services or the billing of those services.  Plaintiff sued an attorney and professional corporation under the Consumer Fraud Act for deceptive billing practices.  The trial court granted the motion to dismiss the Consumer Fraud Act claim.  The Third District Appellate Court, citing 
Gadson
 and 
Frahm
, found that the Consumer Fraud Act, although not applicable to the actual practice of law, is applicable to the "commercial aspects" of a law practice, including billing for legal services and reversed the trial court.  
Cripe v. Leiter
, 291 Ill. App. 3d at 163.  However, the Illinois Supreme Court found that although the "Consumer Fraud Act *** contains no language expressly excluding or including the legal profession within its ambit" (
Cripe v. Leiter
, 184 Ill. 2d at 195), "the legislature did not intend the Consumer Fraud Act to apply to regulate the conduct of attorneys representing clients"  (
Cripe v. Leiter
, 184 Ill. 2d at 199), and affirmed the trial court.

Each of these cases focused on the nature of medical, legal or dental services and whether they are a "trade," "commerce" or a "business" and each case concluded that the legislature did not intend medical, legal or dental services to be included in the broad definitions of the Consumer Fraud Act.

Thus, we conclude that the legislature did not intend to include a dental office as a "place of public accommodation" as that term is defined in the Illinois Human Rights Act.  We conclude this based upon the supreme court's directive to employ the doctrine of 
ejusdem generis
 in interpreting this section of the Human Rights Act, upon its holding that the legislative enumeration in section 5 101 (A)(2) of the Human Rights Act anticipated a restaurant, pub, or a bookstore, which are obviously not similar to a dental office, and further, upon judicial interpretations of a similar and arguably broader remedial statute, the Consumer Fraud Act, holding that medical, legal and dental services are not "trade" or "commerce," words similar to "business" in the Human Rights Act.

V.  CONCLUSION

Accordingly, we reverse the order and decision of the Commission and need not consider petitioner's other arguments.

Reversed.

O'Brien, J., concurs. 

JUSTICE O'MARA FROSSARD, dissenting:

The Human Rights Act prohibits unlawful discrimination.  It in no way prohibits a dentist from refusing to treat a patient or referring a patient for legitimate, nondiscriminatory reasons.  Based on the facts of this case I cannot agree that petitioner's dental office is exempt from the Act.  

The purpose of statutory construction is to effectuate the intent of the legislature which, under this Act, is to provide all individuals freedom from discrimination in places of public accommodation.  775 ILCS 5/1-102(A) (West 1992)
.  As a remedial statute, the Act should be liberally construed to effectuate its purpose. 
Arlington Park Race Track Corp. v. Human Rights Comm'n
, 199 Ill. App. 3d 698, 703 (1990).  When interpreting a statute as part of a regulatory scheme, courts are not only to recognize the relationship between the statute and the regulatory agency enforcing the statute, but are to defer to that agency's interpretation of the statute.  
City of Decatur v. American Federation of State, County & Municipal Employees, Local 268
, 122 Ill. 2d 353, 361. (1988).  Applying that principle, the conclusion of the Commission that petitioner's dental office was a "place of public accommodation" should be accorded "substantial weight and deference." 
Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n
, 95 Ill. 2d 142, 152 (1983).

B
asic principles of statutory construction additionally support the Commission.  Courts must interpret a statute within the plain meaning of the words used in the statute and "when the language is clear, it will be given effect without resort to other aids for construction."  
Kunkel v. Walton
, 179 Ill. 2d 519, 534 (1997).  Petitioner cannot be exempt from the Act without holding that the legislature did not mean what the plain language of the Act says:  " 'Place of public accommodation' means a business *** of any kind *** whose *** services are *** made available to the public."  775 ILCS 5/5-101(A)(1) (West 1992). No rule of statutory construction authorizes a court to conclude that the legislature did not mean what the plain language of the statute imports.  
Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.
, 158 Ill. 2d 76, 83 (1994).

The majority's claim that a broad interpretation of "place of public accommodation" would render some of the statutory language superfluous is unpersuasive.  The Act lists a wide range of  facilities that meet the statutory definition of a "place of public accommodation."  775 ILCS 5/5-101(A)(2) (West 1992).  The list is not meant to be exclusive, but illustrative.  The prefatory language states "[b]y way of example, but not of limitation." 775 ILCS 5/5-101(A)(2) (West 1992).  These words undercut the majority's conclusion that this list exempts businesses not specifically enumerated. The illustrations are examples of businesses, like petitioner's office, that offer services to the general public, with no preconditions other than the ability to pay for the services.   

The majority further fails to note the exemptions to the Act, which include private clubs and private facilities. 775 ILCS 5/5-

103 (West 1994). By these exemptions, the legislature recognizes that the prohibition against discrimination does not apply to facilities that by their nature are distinctly private.  Petitioner's office was not distinctly private, selective or exclusive. When interpreting such exemptions, our supreme court has stated, "It is established in statutory construction that the expression of certain exceptions in a statute will be construed as an exclusion of all others."  
State of Illinois v. Mikusch
, 138 Ill. 2d 242, 250 (1990).  Under that rule of statutory construction, petitioner is not exempt.  Had the legislature intended such an exclusion, it could have so provided.  Neither statute nor case law supports the majority's decision to create a judicial exemption.

The majority further relies on the doctrine of 
ejusdem generis
 as applied in 
Board of Trustees of Southern Illinois University v. Department of Human Rights
, where the supreme court decided that an academic program in a public university is not a place of public accommodation.  However, that decision is consistent with the application of the Act to petitioner.  A public university does not offer services to the general public as did petitioner.  Only students who meet the admission guidelines, are accepted and pay tuition may participate in the academic programs.  A public university selects individuals based on specific criteria, academic performance and test scores, and excludes those that fail to meet the criteria.  In contrast, the petitioner did not impose any selection criteria, admission requirements or exclusions.  

The Commission found that petitioner's dental services were offered and available to the public and petitioner accepted any person requesting dental services.  Each of the 27 years that petitioner had been in business he advertised in the Yellow Pages.  He sold his services to thousands of individuals and had about 3,000 active patients.  He accepted at least 10 new patients every month.  Under different facts, a dental office whose services are not offered and available to the general public may not constitute a place of public accommodation.  However, petitioner's doors are open to any member of the public who desires to become a new patient.  Therefore, applying the doctrine of 
ejusdem generis
, petitioner's dental office, which offered its services to the public with no preconditions, is similar to the facilities listed in the Act and is subject to the Act.

The majority analogizes to cases that have exempted the practice of law and medicine from the Consumer Fraud Act to support their conclusion that dental services are excluded from the Human Rights Act.  See 
Cripe v. Leiter
, 184 Ill. 2d 185 
(1998); 
Gadson v. Newman
, 807 F. Supp. 1412 (C.D. Ill. 1992). These cases provide little guidance as to whether a business that offers routine dental services to the general public is a "place of public accommodation" under the Act.  The analogy is weakened by the fact that the two Acts are considerably different. Fraud perpetrated upon consumers is different from unlawful discrimination. Although both Acts are remedial, the Human Rights Act is much broader in nature, scope, and purpose than the Consumer Fraud Act.  The protection afforded by the Consumer Fraud Act is limited to consumers, borrowers, and businessmen, while the Human Rights Act is designed to protect all individuals.  The Consumer Fraud Act is limited to prohibiting fraud and deceptive acts or practices. The Human Rights Act is not so limited but prohibits all types of unlawful discrimination based on race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental handicap, or unfavorable discharge from the military.

The majority fails to recognize that the cases that they rely upon exempt the legal and medical professions from the Consumer Fraud Act because, in the context of fraudulent business practices, there are preexisting professional regulations that already provide remedies to the citizens of this state.  See 
Cripe
, 184 Ill. 2d at 197-98; 
Gadson
, 807 F. Supp. at 1420. The majority cites no body of professional regulations analogous to the professional regulations and available remedies relied upon by the courts in 
Gadson
 and 
Cripe
 that regulate petitioner's discriminatory conduct
.
 
The Consumer Fraud Act analogy does not support the majority's conclusion in this case, but leads to the opposite conclusion.  The reasoning of the courts in 
Cripe
 and 
Gadson
 supports the conclusion that the Human Rights Act should apply to petitioner since it is the exclusive form of redress in Illinois for civil rights violations and no preexisting professional regulations make any other remedies available to citizens of this state for discrimination. 
Mein v. Masonite Corp.
, 109 Ill. 2d 1, 7 (1985).

For the foregoing reasons, I respectfully dissent.